(No. 10869.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MORRIS LURIE, Plaintiff in Error.

*Opinion filed February 21, 1917.*

1. CRIMINAL LAW—*evidence of use of brass knuckles may be circumstantial.* Evidence as to the use by the defendant of brass knuckles or other instrument in striking the deceased need not be direct and positive in order to justify the jury in finding the defendant guilty of murder and not merely of manslaughter, as would be required had the defendant used his bare fist.

2. SAME—*trial judge may question witnesses in order to ascertain truth.* The trial judge has a right to ask questions of witnesses or call other witnesses to the stand in order to ascertain the facts and elicit the truth as to the points at issue, but this must be done in a fair and impartial manner, without in any way showing bias for or prejudice against either party.

3. SAME—*when it is the duty of trial judge to examine witnesses.* In a criminal case, where justice is likely to fail because a certain fact has not been developed or a certain line of inquiry pursued, it is the duty of the trial judge to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice, but in so doing he must not forget the function of the judge and assume that of the advocate.

4. SAME—*trial judge should not comment on value of evidence offered.* In ruling as to the admissibility of evidence the remarks of the trial judge should be of such nature as to show only whether he thinks the evidence is admissible, expressing no opinion as to its truth or falsity, either orally or by instructions, and when the competent evidence has all been heard the court should state the law, only, leaving the jury to determine the facts.

5. SAME—*what is an abuse of discretion in examining witness.* In examining a witness it is an abuse of discretion for the presiding judge to so frame his questions as to intimate his opinion as to the credibility of a witness or to convey to the jury his opinion of the evidence, but the extent to which he may participate in the examination of a witness depends largely upon the circumstances of the case and the conditions arising during the trial.

6. SAME—*when abuse of discretionary duties by trial judge will reverse.* Where the evidence is close or doubtful and the rights of the accused have manifestly been prejudiced by comments of the trial judge on the evidence or questions put by him to witnesses, so

that the reviewing court cannot say that, disregarding such abuse, the jury could have reached no other verdict under the competent evidence, it is the duty of the court of review to see that justice is properly administered and the accused given a fair trial.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. DAVID M. BROTHERS, Judge, presiding.

JAMES J. BARBOUR, for plaintiff in error.

P. J. LUCEY, Attorney General, GEORGE P. RAMSEY, and D. E. DETRICH, (MACLAY HOYNE, State's Attorney, MARVIN E. BARNHART, and EDWARD E. WILSON, of counsel,) for the People.

Per CURIAM: Plaintiff in error, Morris Lurie, was indicted with three others, at the September term of the criminal court of Cook county, on the charge of the murder of Edward Laux by assault committed in August, 1915, one count charging the assault was committed with brass knuckles, and the second count that the assault was committed by some violent means, the more particular description of which was to the jurors unknown. At the close of the evidence on the trial the State *nolled* the case as to all the defendants except plaintiff in error. The jury returned a verdict finding him guilty of murder, fixing the penalty at fourteen years in the penitentiary. Motions for new trial and in arrest of judgment were overruled and judgment entered on the verdict. From that judgment this writ of error was sued out.

On the evening of August 28, 1915, a social party was held at the home of Rudolph Kuhagan, who was living in the lower flat at 1920 South St. Louis avenue, Chicago. The party was attended mostly by young men and women of Irish extraction. Several young men of Jewish descent came to the house early in the evening and were invited in by some of the people who were attending the party, for the

purpose of furnishing entertainment by singing and playing the piano. One of these young men was named Belovsky but went by the name of Gibson. Another was named Max Matnick but when entertaining went by the name of Grant. About 11:30 that evening the Jewish boys were requested, as the house was somewhat crowded, to leave, as only those who had written invitations were desired to stay. After some discussion the young Jews got their hats and left peaceably, although there is some testimony tending to show that as they left some of the bystanders made some remarks about "sheeneys." According to the testimony for the defense these young men walked about a block and then stopped in a garage, and they testified that a number of the young men from the party followed and were waiting outside of the garage to injure them when they came out. Two of the young Jewish men jumped on a street car and rode some distance to Miller's restaurant, where they informed a man named Rosenberg, and some others, that the two men, Belovsky and Matnick, were in danger of being set upon and mistreated by the young men from the Kuhagan party. The testimony tends to show also that Belovsky, in the meantime, had telephoned some of his friends to the same effect. Rosenberg and those with him understood from what had been reported to them that Belovsky and Matnick were still at the Kuhagan home. Rosenberg, William Edelstein and Morris Leventhal, who were at Miller's restaurant, decided to go to Kuhagan's in an automobile to see if they could bring away the two young men they thought were there. Just as they were getting ready to go the plaintiff in error came into the restaurant and was asked by Edelstein, who knew him, to go along with them. The testimony shows that these four,—Rosenberg, Edelstein, Leventhal and Lurie,—got into the automobile, and then Lurie asked where they were going, and they replied they were going to get Gibson and another boy who were at the party at Kuhagan's and were afraid of

being molested and wanted some friends to come and bring
them home. Plaintiff in error said he thought there was a
tough bunch around that neighborhood. Edelstein replied,
"They won't be at the party; you let me talk to the fel-
low" and there would be no trouble. The evidence shows,
without contradiction, that plaintiff in error knew nothing
about the matter until after he got into the automobile.
Rosenberg drove the car to the Kuhagan home, on St. Louis
avenue, where there were about twenty-five couples of
young people assembled, some of them in the house and
some of them apparently on the porch, about to leave for
home. Rosenberg stayed in the machine and the other
three left the machine and went up to the porch. The
elder Kuhagan came to the door, and, apparently somewhat
excited, went down to the automobile and asked what the
machine was doing in front of his house. Edelstein said,
in effect, "We are not looking for trouble, Mr. Kuhagan,
but there are some of my friends in the house and we want
to see them." Kuhagan then apologized for not having
room enough to invite them into the house, and Edelstein
testified that he (Edelstein) said, "I hope you haven't the
impression we came to the party; we just came to get the
boys home." Kuhagan replied, "That's all right." Edel-
stein and Leventhal testified they immediately got back into
the car, the engine of which was running all the time, and
started away without the plaintiff in error. In the mean-
time the persons at the Kuhagan party had filled up the
sidewalk in front of the house and according to plaintiff
in error's testimony surrounded him so they were blocking
his way to the machine. There was an iron railing from
the porch down to the cement walk running out to the side-
walk bordering the street. An electric light was situated
some distance away, but owing to the darkness and the
shade of several trees in front of the house it was impos-
sible to see, according to the witnesses, just what took place.
Plaintiff in error testified that as he turned to go to the

machine Edward Laux, the deceased, grabbed hold of him,
he did not know what for; that they had had no words
before; that plaintiff in error gave Laux a push and turned
around and ran towards the machine; that the car had al-
ready started and he had to run some distance before he
could jump onto the running board; that he did not know
whether Laux fell or not; that he did not look back. Nora
Kuhagan, the daughter of the one who gave the party, tes-
tified that when Lurie came from the machine to the porch
the porch was crowded; that she noticed Edward Laux,
who was one of the guests at the party, out on the front
sidewalk; that she went down to the sidewalk with her
father around to where Laux was standing; that Lurie was
in front of Laux and took a look right at his face and then
stepped back, and that she "noticed him fixing something in
his hands; I didn't know what he was doing, but I sup-
posed he was putting something on his hands, and then all
of a sudden I saw him make a blow or strike Mr. Laux
right on the side of the head." She further testified that
Laux fell right out straight, like a board, on his back, on
the sidewalk; that she saw plaintiff in error run towards
the departing machine, and shortly after that she fainted
away. She heard no conversation between Laux and Lurie.
Rudolph Kuhagan, Jr., testified that he saw plaintiff in er-
ror have his hands in his pockets; that "I saw him fool
with his hands; whatever he was doing I don't know;
* * * he stepped up and hit him and Mr. Laux fell down;
I stooped to pick up Mr. Laux and I saw he was stiff."
Frank Lannartz testified that a fellow standing in front of
Laux hit Laux behind the ear and then fled to the automo-
bile. None of the other witnesses claimed they saw just
what plaintiff in error did to Laux. Some of them testi-
fied that the head of deceased struck nothing but the side-
walk; others say they could not see whether he struck the
iron railing or not. Several of the witnesses who were
among the Kuhagan party testified that when young Ku-

hagan and others ran after plaintiff in error towards the automobile several people in the automobile drew revolvers on them. All of the defendants testified that no revolvers were drawn in the automobile and that none of them had such weapons. Some of the witnesses also testified there were as many as fifteen or twenty people in the automobile and on the running board when the car was standing in front of the house and just when it was leaving. Rosenberg and the other three who came to the Kuhagan residence with him in the automobile all testified that they only saw the four people in the automobile when they were going away. One of the witnesses at the party testified that there were eight or ten in the automobile when it came up to the house, and another testified that he thought there must have been about eighteen in the machine when it came up. He stated on cross-examination that at the inquest he told the coroner that he thought there were from twelve to sixteen in the machine. It is evident from the testimony of these witnesses that they did not have any definite idea as to how many there were in the car when it came up or went away.

The coroner's physician, Dr. Burmeister, testified that Laux had an injury on the left side of the head, which he described in detail, and that death was caused, in his opinion, by shock and intercranial hemorrhage, due to the fracture of the skull, which fracture was caused by external violence; that the object which produced this fracture must have been very firm, very hard and definitely outlined, and the force or violence used must have been very severe in order to produce the punched out appearance and the fragments of bone; that in his opinion the injury could not have been produced by the bare human fist. On cross-examination he stated that the wound might have been produced by the head coming in contact with an iron railing or the corner of a hardwood step, or an object on the sidewalk if such object was a hard and well outlined one.

Laux never recovered consciousness and died a day or two after the injury. Plaintiff in error testified positively that he did not strike the deceased,—simply gave him a push or a shove. He also testified that he did not use brass knuckles and had none on his person and did not have anything in his hands when he pushed the deceased. None of those who went with him in the automobile saw him have any weapon of any kind. Young Kuhagan and his sister are the only witnesses who testified to anything indicating that he used anything but his bare fist, and we have given their testimony on this point substantially in full.

Counsel for plaintiff in error first insists that if any offense is proven it was manslaughter, and not murder, under the statute and the authorities in this State, citing in support, among other decisions, *People* v. *Mighell,* 254 Ill. 53, and *Silgar* v. *People,* 107 id. 563. If the evidence were clear and uncontroverted that plaintiff in error did not use brass knuckles and had no other instrument or thing liable to produce death in his hands at the time but simply struck or pushed the deceased with his bare hands, then, under the statute as construed by the decisions of this court, on the facts in this case plaintiff in error could only be held guilty of manslaughter. The evidence as to the use by plaintiff in error of brass knuckles or other instrument or thing liable to produce death does not necessarily have to be direct and positive,—it may be circumstantial. The evidence, however, as to the character of crime committed is of such a nature that the rulings of the trial court during the hearing of the case should have been such as not to prejudice in any way the rights of plaintiff in error.

The chief contention of counsel for plaintiff in error is the prejudicial attitude assumed by the court in his questions to the witnesses and remarks on the evidence during the trial of the case. When Nora Kuhagan was testifying, she stated that all of the defendants on trial got into the auto to leave. As a matter of fact the defendant Belovsky

was not present at the Kuhagan house when the automobile was there, and the court interrupted her, stating, "You mean all but Belovsky?"

When counsel were asking questions to bring out who had invitations to the party, the witness on the stand said, "Belovsky was there but not the others." The court interjected the statement, "They [plainly meaning all the defendants] were there." A witness was asked by counsel, "There were a number of Jewish boys at the party, weren't there?" and answered, "Yes, sir." The court remarked, "Some by invitation and some without invitations; those without invitations had no business there." It was the claim of the defense, and there was evidence tending to uphold that claim, that the first group of Jewish young men came to the house at about 10:30 that night and went into the house because they were invited to come by someone who they thought had a right to invite them. The people in the automobile, according to their testimony, went to the house to ask for friends, and counsel rightly argues that if that was their only purpose they had a right to go there and ask for their friends. A visit for that purpose would be on legitimate business, but, of course, while they were there, finding out as to whether their friends were at the house, they must act in a peaceable and law-abiding way. Counsel for one of the defendants asked a witness, "As a matter of fact they were there on invitation?" The court said, "No; they came to the house and asked for an invitation." Counsel then asked the witness, "They were invited in?" The court commented, "In response to their request." Counsel then took an exception to the remarks of the court, and the court said, "Take it and go on, and don't waste any time about it."

Plaintiff in error denied that he struck the deceased but claimed he only pushed or shoved him. During the examination of one of the witnesses on this question the court remarked as to the testimony, "No; he means the man

that was struck and fell." Later in the trial the court, in his remarks, again stated that the deceased "was struck." When Nora Kuhagan was being questioned as to whether Lurie had struck the deceased and how he struck him, she answered in response to the question, "Did he [Laux] strike him or make any effort to strike him, or anything of that sort?" "No, sir; he had his hands in his pockets." Counsel then said, "That is, as far as you know?" The judge then commented, "She stood right beside him; it is as far as anybody could know." Counsel objected, and said, "No, she didn't say that; she was in back of him." The court replied, "She was right back of him." It is evident from reading Miss Kuhagan's testimony that there was quite a crowd around her, the deceased and plaintiff in error, and she was not clear as to just how close she did stand to Laux.

Counsel for plaintiff in error, in cross-examining Herbert Kuhagan, asked him whether or not he was referring to "your own crowd." The witness answered, "Those that had invitations." The court said, "He answered that three times; he meant his own crowd were those that had invitations." He further at this point told counsel, "You will confine yourself to direct examination and not go fishing." When counsel asked to take an exception to this remark the court replied, "All right; take it." As we read the record counsel was not "fishing" in his questions but was asking proper questions on cross-examination that legitimately referred to the direct examination of the witness. The court here in his comments was clearly intimating to the jury that the only proper way to get into the Kuhagan house that evening was by written invitation and that none of the defendant's party had written invitations.

When one of the State's witnesses was being cross-examined as to the number of revolvers he saw flash in the automobile as it was going away and if he did not testify differently at the coroner's inquest, the court commented, "Well, you can't expect him to recall everything he said

last August." In this same connection the witness was
asked as to his statements as to how many were in the
machine, at the coroner's inquest, as compared to his state-
ment at this trial, and the court suggested, "You were
giving your best judgment then as you are now? Is that
a fact?"

When Mrs. Kuhagan was asked to describe how the
blow was struck, the court said, "I think she has described
that; a woman cannot illustrate how a man is struck any
better than she did."

When one of the counsel for plaintiff in error asked
Rosenberg which of the defendants asked him to take them
to the party, counsel stated, "We cannot try them jointly
unless we know which one it is." The court remarked,
"We are trying them jointly." Counsel said, "Yes, but
they are not liable jointly." The court said, "Oh, yes, they
are; it is for the jury to fathom that out; they pass on
the evidence; he can only give his best recollection."

When Rosenberg was testifying as to how many people
were in the automobile and whether they had revolvers or
not, the court asked, "You don't know whether there were
twenty guns in the back?" and the witness answered, "No,
sir." The judge then said, "You didn't testify to anything
that took place in the back of the car?" The witness an-
swered, "No, sir," and the court said, "You didn't want to,
did you?" Counsel stated that he took exception to the
comments of the court, and the court said, "All right; take
two of them." Another counsel then said, "I take another
exception to that," and the court replied, "Take another."
After putting several more questions to the witness the
court asked him, "You don't know whether you lost a
couple of fellows out of the back end of your car?" Coun-
sel objected, and the court asked, "They might have fallen
out, so far as you know?" Counsel again objected, and
the court overruled the objection and said to the witness,
"What is your answer?" and the witness said, "Well, I

couldn't see in the back because I was driving." The court then asked, "And if they had fallen out or jumped out you wouldn't know it, would you?" and was answered, "No, sir."

When one of the defendants, Morris Leventhal, was on the stand he stated in answer to a question, that after the trouble, when they were driving away, he was wondering whether they had overdone—and the court interrupted, "Cut out your wonderings, Mr. Witness; you understand you are sworn to tell the truth here." The witness answered, "I am, your honor." The court then said, "Then tell us what was said and done and cut out your conclusions, and don't let me tell you that again."

One of the witnesses for the defense testified that he was frightened because he thought some of the guests from the party were "laying for him" when he was returning from the Kuhagan party, and the court asked, "Still frightened, aren't you?" And when Edelstein was on the stand the court said, "Tell the truth about the number that were in that car."

Other comments and suggestions by the court were made while the trial was in progress, to which counsel objected, but we have set out enough to indicate the general character of the questions and statements which are relied · upon by counsel for plaintiff in error as the chief reason for a reversal.

The general rule is that the trial judge has a right to ask questions of witnesses or call other witnesses to the stand in order to ascertain the facts and elicit the truth as to the points at issue. No well considered authority has ever stated that the trial judge is a mere moderator or umpire between the contending parties. In order to establish justice and prevent wrong he has a large discretion in applying the rules of practice, but all this must be done in a fair and impartial manner, without in any way showing bias for or prejudice against either party to the litigation.

The respective counsel in any case are usually much more familiar with the facts than the presiding judge, and as a rule the trial will proceed in a more orderly and satisfactory manner when they are allowed to examine and conduct the examination of the witnesses. It is important, however, that the trial judge should also become acquainted with the facts, and on this account he may, if necessary to ascertain them, propound questions to the witnesses. It is the judge's duty to see that justice is done, 'and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice, but in so doing he must not forget the function of the judge and assume that of the advocate. (*O'Shea* v. *People,* 218 Ill. 352; *People* v. *Bernstein,* 250 id. 63; Jones on Evidence,—2d ed.—sec. 815.) Rarely, if ever, is a trial judge called upon to comment on the evidence during the trial of a case except when necessary in ruling as to the admissibility of certain evidence, and then his remarks should be of such nature as to show only whether he thinks the evidence is admissible for the jury to consider for what it is worth, expressing no opinion himself as to its truth or falsity. Everyone with any experience in the trial of cases in court appreciates that any intimation, however slight and unconsciously made, by the court in the presence of the jury is liable to have the force and effect of evidence and may be most damaging to the party against whom it is · made. It is not the province of the court in a criminal case, in this jurisdiction, to express any opinion on the facts, either orally or in the form of instructions, but when the evidence has all been heard the court should state the law, only, and leave the jury to judge the facts. (*Weyrich* v. *People,* 89 Ill. 90; *Marzen* v. *People,* 173 id. 43; *Briggs* v. *People,* 219 id. 330.) It is therefore an abuse of his discretion for the presiding judge to so frame his questions

276 — 41

as to intimate any opinion as to the credibility of a witness or to convey to the jury the court's opinion of the evidence in the case. The extent to which the trial judge may purposely participate in the examination of a witness must depend very largely upon the circumstances of the particular case and the conditions which arise during the trial. The general rules that should govern the trial court and the manner in which his discretion should be exercised on such questions are well illustrated and set forth, in this and other jurisdictions, in the authorities already cited as well as in the following: *Kennedy* v. *People,* 44 Ill. 283; *Burke* v. *People,* 148 id. 70; *Dunn* v. *People,* 172 id. 582; *Synon* v. *People,* 188 id. 609; *Featherstone* v. *People,* 194 id. 325; *People* v. *Rardin,* 255 id. 9; *Arkansas Central Railroad Co.* v. *Craig,* 6 Ann. Cas. 476, and note; *Glover* v. *United States,* 8 id. 1184; *South Covington Street Railway Co.* v. *Stroh,* 57 L. R. A. (Ky.) 875, and note; 1 Wharton on Crim. Evidence, (10th ed.) sec. 452; 1 Wigmore on Evidence, sec. 784; 5 Ency. of Evidence, 381; 8 Ency. of Pl. & Pr. 71-73; *State* v. *Keehn,* 85 Kan. 765.

We are convinced that in the examination of the witnesses in this case the trial judge made statements and asked questions in such form as would almost certainly lead the jury to believe that he thought plaintiff in error was guilty of murder as charged in the indictment, and that he thought certain witnesses for the defense were not telling the entire truth and that certain witnesses for the State were stating the facts as they actually existed. Such an impression conveyed to the jury by the presiding judge could not be otherwise than greatly prejudicial to plaintiff in error and his defense. Appreciating fully the necessity of orderly proceedings in the trial of cases, courts of review are, and should be, reluctant to interfere and reverse a cause because of a seeming or real abuse of the discretionary duties resting upon the trial judge, but when the rights of the accused have manifestly been prejudiced by the comments on the evi-

dence or the questions of the trial judge a reviewing court cannot sanction such practice; and where the evidence as to the guilt of the accused is close or doubtful, and the reviewing court, under the competent evidence in the record, cannot say that, regardless of this abuse of the trial court's discretion, the jury could reach no other verdict than was found, then it is the duty of such court of review to see that justice is properly administered and the accused given a fair trial. The evidence in this cause as to the guilt of the plaintiff in error of murder, as charged in the indictment, is of such a nature that we are compelled to hold that the plaintiff in error was prejudiced by the remarks of the judge and by his method of examining certain witnesses.

Counsel for plaintiff in error further argues that the court erred in giving the People's seventh instruction, in that the jury might conclude from it that the court was of the opinion that the assault was committed as alleged in the indictment. This instruction was so worded as to be subject to this criticism and should not have been given in that form.

The judgment of the criminal court will be reversed and the cause remanded.     *Reversed and remanded.*