Daniel H. Bailey, Appellee, v. Orville E. Babcock et al., Appellants.

Gen. No. 35,533.

MATCHETT, J., dissenting.

Heard in the first division of this court for the first district at the October term, 1931. Opinion filed February 29, 1932. Rehearing denied March 14, 1932.

ASHCRAFT & ASHCRAFT, for appellants; CARROLL J. LORD, of counsel.

BARTHELL & RUNDALL, for appellee.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff brought an action of trover against the defendants, stockbrokers, claiming that they had converted to their use plaintiff's 200 shares of common stock of the Utility and Industrial Corporation. The defendants filed a plea of not guilty, and there was a jury trial which resulted in a verdict and judgment in plaintiff's favor for $4,300, and the defendants appeal.

Plaintiff's theory of the case was that the 200 shares of stock were bought by the defendants for him, that

he tendered them the balance due and demanded the stock but that the tender and demand were refused. On the other hand, defendants' theory was that they had, at plaintiff's order, bought 100 shares of other stock at $66 a share; and that they were entitled to hold the 200 shares of stock until plaintiff had paid for the 100 shares.

The record discloses that plaintiff had been buying stocks through the defendants, brokers, who were carrying the stocks on a margin of 50 per cent, and on Saturday, August 3, plaintiff telephoned the defendants and requested them to buy for him 100 shares of stock of the Chicago Corporation at $67 a share. This stock apparently could not be bought on Saturday for $67 a share, and it is agreed that the stock was not purchased on that date. The evidence further shows that over Sunday plaintiff became interested in the Utility and Industrial Corporation stock and on Monday morning when he got to his office he called up defendants' representative and inquired whether defendants had bought the 100 shares of Chicago Corporation as ordered, and upon being advised by defendants' representative that the stock had not been bought, plaintiff requested that the order be canceled, which defendants agreed to do, and thereupon plaintiff requested defendants to buy 200 shares of the Utility and Industrial Corporation, which they also agreed to do.

The testimony as to what was said at this telephonic conversation is somewhat variant but not materially so. Plaintiff testified, ''I called him (Mr. Lundborg) promptly at nine o'clock on the Monday morning following Saturday, August 3, 1929. . . . I talked to Mr. Lundborg and told him that I had changed my mind, I would like to buy Utility Industrials instead of Chicago Corporation, and asked him if the Chicago Corporation order had been executed, and he said,

'Well, I don't think so, but I will find out.' I says, 'Well, be sure to find out please and I will hold the 'phone.' Mr. Lundborg left the 'phone and in a short while returned, and says, 'Your Chicago Corporation has not been purchased and I have cancelled it.' I says, 'All right, instead of buying Chicago Corporation for me then I want you to buy instead of that 200 Utility Industrials.' ''

Lundborg testified that he was employed by defendants and that about 11 o'clock on the morning of Saturday, August 3, plaintiff placed an order with defendants to buy 100 shares of Chicago Corporation at $67. The stock was then selling at $70; that "The next conversation I had with Mr. Bailey was on August 5, 1929, in the morning. This conversation took place about ten minutes after nine. Mr. Bailey called on the 'phone . . . and asked what Utility Industrial was selling at. I called out to the Chicago Board marker and he replied, '56½' and I told Mr. Bailey . . . Utility Industrial Corporation was selling at 56½. Then Mr. Bailey asked me if the Chicago Corporation order had been purchased yet, and I told Mr. Bailey, 'Just one minute, while I look at the Chicago Board.' I left my desk and ran about ten feet to the Chicago Board and I saw one sale of Chicago Corporation marked up at 69 and ran out to my 'phone immediately and told Mr. Bailey that I did not think it had been bought. It was marked up now at 69. Mr. Bailey told me to cancel the order to buy Chicago Corporation and enter an order to buy 200 Utility Industrial at the market, and I wrote out the order, 'Cancel buy Chicago Corporation at 67 open and buy Utility Industrial common at market,' I wrote this out as I spoke to Mr. Bailey on the 'phone.''

The evidence further shows that shortly thereafter defendants bought the 200 shares of the Utility stock and plaintiff was advised of that fact by telephone.

And there is some evidence that sometime during that day Lundborg telephoned plaintiff that the 100 shares of Chicago Corporation had also been bought. The next day, August 6, plaintiff received from defendants, by mail, two communications, one showing that they had canceled the order for the 100 shares of Chicago Corporation, the other that they had bought the 200 shares of Utility stock. Some time later on defendants advised plaintiff that they had also bought the 100 shares and that they had been in error in notifying him that this order had been canceled.

The evidence further tends to show that plaintiff did not want the 100 shares of stock and that defendants were advised of this fact; that plaintiff ought not to be held on account of defendants' mistake. A few days later plaintiff called on the defendants and stated that his banker had advised him to see some member of the firm about the matter and he took the matter up with Mr. Rushton, a member of the firm of brokers. The evidence shows that plaintiff had with him at that time three documents he had received from the defendants concerning the transactions, one of which was that the defendants had canceled the order for 100 shares. Mr. Rushton stated that apparently there was a mistake and asked plaintiff to leave the papers and he would look into the matter and in a few days would advise plaintiff and return plaintiff's papers to him. The papers were left and apparently Mr. Rushton looked into the matter and returned two of the papers but did not return the document which stated that the order for 100 shares had been canceled, as he had agreed to do.

Lundborg further testified that on August 6, after the purchase by the defendants of the two stocks, he again talked with plaintiff over the telephone and that plaintiff said that if there was a mistake like that he felt Babcock and Rushton should go along with him;

that just at that time he did not feel that he should be required to put up the full 50 per cent margin to carry the 300 shares of stock and I told him that I would check up with Mr. Rushton in view of this state of affairs and see if we could not carry the full 300 shares on a third margin rather than to require a 50 per cent margin on 200 shares of Utility Industrial as it would require the same amount of money practically in either case. And there is evidence tending to show that subsequently defendants reduced the margin requirements to one-third. Lundborg further testified that the first time plaintiff ever told him he would not be responsible for the Chicago Corporation stock was when Lundborg called plaintiff for additional margin in October, 1929. This was denied by plaintiff.

Defendants offered a great deal of other evidence showing the method by which they transacted business in the purchase and sale of stock. The court at first sustained plaintiff's objections that this was immaterial, but later some of this evidence was admitted and we think erroneously so. While it is a general rule of law that a broker is the agent of the customer in the buying and selling of stock and is required only to use ordinary care and intelligence in the execution of orders, yet that principle has its limitations, and if a broker makes a mistake in informing his customer as to what has been done in a particular situation, and the customer then changes his position on the faith of the broker's statement and acts upon it, the broker cannot afterwards deny the correctness of the statement. Meyer on Law of Stockbrokers and Stock Exchanges, pp. 293, 294. That author announces the rule as follows: "If the broker transmits a statement in which, through a clerical error, a more favorable price is reported than that at which the order was actually executed, he is entitled to send a duplicate corrected

statement, provided that the customer has not changed his position on the faith of the original statement. In such a case the broker is not estopped to deny the accuracy of the statement first sent. However, if the customer has changed his position on the faith of the broker's statement and acted upon it, the broker will subsequently be estopped to· deny its correctness.'' This law is applicable to the facts in the case before us. If the defendants made a mistake in advising plaintiff that the 100 shares of Chicago Corporation had not been bought, and it is clear that they did make such mistake and plaintiff, acting on such misinformation, ordered the defendants to cancel the order for the Chicago Corporation stock and to buy the Utility stock, then the defendants will not be permitted to endeavor to avoid the consequences of their own mistake. All of the evidence shows that plaintiff, on Monday morning, informed defendants that he was interested in buying the Utility stock and. in canceling the order for the Chicago Corporation stock. Lundborg was clearly told this and, if the Chicago Corporation stock had not then been bought, to cancel the order and buy the Utility stock; and then Lundborg, after investigating the matter to ascertain the facts, advised plaintiff that the Chicago Corporation stock had not been bought; that the order was then canceled and the order for the Utility stock given. A memorandum of these two orders was written out by Lundborg and is of much more evidentiary value than his testimony to the effect that he did not think the Chicago Corporation stock had been purchased. Plaintiff's order to buy the Utility stock was upon the express statement of Lundborg, defendants' representative, that the order to ˙buy Chicago Corporation stock had been canceled. If defendants made a mistake either in notifying the plaintiff that the first order was canceled when it was not, or in purchasing the Utility stock without having canceled the order for Chicago Corporation, the mis-

take was the defendants' and they should not be permitted to avoid liability by simply explaining how their mistake occurred. Plaintiff changed his position on the information given him by defendants, and under the law they must stand the consequences of their mistake.

Complaint is made of remarks made by the trial judge concerning certain witnesses and evidence offered by defendants, and some of the complaints would be justified were the evidence offered material and competent; but this evidence was all to the point that the defendants had exercised reasonable care in endeavoring to carry out plaintiff's orders. Under the facts in this case, we hold that that evidence was incompetent, therefore the remarks of the court would not warrant us in reversing the judgment.

Complaint is made that the court erred in refusing an instruction requested by defendants on the question whether after the 300 shares of stock were bought by defendants, plaintiff had not ratified the purchase of the 100 shares of Chicago Corporation. The refused instruction is as follows: ''The court further instructs the jury that if you believe from all the evidence in this case that plaintiff assented to the purchase of any stocks or securities by defendants for plaintiff's account, then you are instructed that plaintiff is liable to defendants for the amount of the purchase price of such stocks or securities so purchased, if any, even though such stocks or securities were purchased without a previous order from plaintiff to defendants or after plaintiff had given defendants or their agents, instructions to cancel such orders, if any, previously given, and even though defendants, by the exercise of reasonable skill and diligence, could have made effective any cancellation order previously given by plaintiff to defendants or defendants' agents.'' We think it obvious that this instruction was properly refused. It is misleading and confusing and not based on the

evidence in this case. By it the defendants sought to have the jury told that plaintiff would be liable to the defendants for the amount of the purchase price of stocks or securities, "even though such stock or securities were purchased without a previous order from plaintiff to defendants." Of course the evidence all shows that there was a positive order to buy the 100 shares, and it is elementary that it is not error to refuse an instruction which is not based on the evidence in the case but contrary to it.

The defendants' evidence by which it is shown, as they apparently contend, that plaintiff ratified the purchase of the 100 shares of stock, is slightly more, if anything, than a scintilla. We think substantially all the evidence shows that throughout plaintiff was repudiating the purchase by the defendants of the 100 shares of stock. It is not every slight error that warrants the reversal of a judgment. On the merits of this case, under the law and the evidence, we are clear that justice has been done, and the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

McSURELY, J., concurs.
MATCHETT, J., dissents.

MR. JUSTICE MATCHETT dissenting: The opinion of the majority of the court it seems to me disregards the well settled rules of law applicable to transactions of the kind here disclosed, disregards the fact that even on plaintiff's theory of the case the issues of fact were not fairly submitted to the jury, and then proceeds to decide the case upon a theory of law expressly disclaimed by plaintiff's brief and upon an issue which was not before the trial court and which is not before this court upon the pleadings. It has been supposed that the general rules of law applicable to a transaction of this kind are well settled. I understand the law to be that in the buying and selling of stocks brokers

act as the agents of their customers, sometimes as the agents of both parties to the transactions. *Saladin v. Mitchell,* 45 Ill. 79; *Banta v. City of Chicago,* 172 Ill. 204; *Markham v. Jaudon,* 41 N. Y. 235; *Richardson v. Shaw,* 209 U. S. 365; Don Passos on Stock Brokers and Stock Exchanges, 2nd ed., vol. 1, pp. 180, 182. If a broker faithfully and diligently executes the order of his customer, the customer is bound as principal and becomes indebted to the broker for the amount the broker has advanced in executing the order of the customer. *Perin v. Parker,* 126 Ill. 201; *Hately v. Kiser,* 253 Ill. 288; *Markham v. Jaudon,* 41 N. Y. 235; Don Passos on Stock Brokers and Stock Exchanges, 2nd ed., vol. 1, pp. 182, 218; Campbell on The Law of Stock Brokers, 2nd ed., pp. 41, 46; Meyer on The Law of Stock Brokers and Stock Exchanges, pp. 254, 255, 266.

The customer has just as much right to cancel an order given and the broker is just as much obligated to exercise skill and diligence where the customer has canceled to prevent the fulfillment of the order as he would be obligated to fulfill the original order. If before the order to cancel is given the broker has become obligated to a third person, or if the order is given too late to be transmitted to the exchange in the exercise of ordinary diligence, the customer is nevertheless bound and held to the trade as made. Meyer on The Law of Stock Brokers and Stock Exchanges, pp. 273, 274; Don Passos on Stock Brokers and Stock Exchanges, 2nd ed., vol. 1, p. 211; *Lloyd v. Silvers* (Tex. Civ. App.), 274 S. W. 253. It is also well settled that the broker has a general lien upon all stocks carried in the customer's account as security for the debit balance owing by the customer to the broker. Campbell on The Law of Stock Brokers, 2nd ed., p. 17; Meyer on The Law of Stock Brokers and Stock Exchanges, pp. 313, 314; *Markham v. Jaudon,* 41 N. Y. 235; *Richardson v. Shaw,* 209 U. S. 365.

It was the theory of defendants in this case (and I think they had a right to show, if they could) that the purchase of the Chicago Corporation stock had in fact been made prior to the cancellation of the order for the purchase of the same given by plaintiff. In support of that theory defendants called a witness by whose testimony they endeavored to show the circumstances under which this purchase was made by them. The record shows the following:

"The Court: You don't think you are going to show that by a clerk in somebody else's office, do you?

"Mr. Lord: I think this is the best evidence that that trade was executed and when it was executed. Here is a man that was right on the floor and got the document at the time.

"The Court: I think that is immaterial. The basis of it is when it was given and when it was canceled, not when it was executed. If they gave it one day and they handled it two or three weeks after, that is their business.

"Mr. Lord: Does your Honor hold that whether the cancellation could be or could not be effective is immaterial in this case?

"The Court: I think in view of the circumstances it is. Whether it can or not is a self-serving declaration. You served a written notice as well as a verbal notice that it was canceled, and they are in evidence. They can't excuse themselves now by coming back afterwards and saying that they couldn't do it.

"Mr. Lord: With all due respect to your Honor, I know you will grant me this permission. I except to the Court's statement, and at this time I make a motion that a juror be withdrawn in this case.

"The Court: Overruled."

To the contention of defendants that these statements by the trial judge in the presence of the jury were prejudicial, plaintiff replies by saying that the evi-

dence defendants offered was wholly immaterial and irrelevant. The evidence was not immaterial on defendants' theory and was certainly not immaterial if Lundborg's testimony was true. Lundborg denied that he had given a verbal notice to plaintiff of the cancellation of the order to buy Chicago Corporation shares and expressly denied the evidence offered by plaintiff tending to show that the order for the purchase of the Utility and Industrial shares was conditioned upon the cancellation of the first order. There is a sharp and decisive conflict in the evidence upon this point. The remarks of the trial judge must have disclosed to the jury that he accepted the testimony of plaintiff and discredited the testimony of Lundborg. They gave the weight of the opinion of the judge in favor of the testimony of plaintiff. The effect could not have been much different had he told the jury that the testimony of plaintiff was to be believed, that of the witness for defendants disbelieved. It is hardly necessary to cite cases to the proposition that in this State it is reversible error for a trial judge to express an opinion on an issue of fact in the presence of the jury. A few of the cases which so hold are *Andreas v. Ketcham,* 77 Ill. 377; *Marzen v. People,* 173 Ill. 43; *Illinois Cent. R. Co. v. Souders,* 178 Ill. 585; *People v. Lurie,* 276 Ill. 630; *Artz v. Robertson,* 50 Ill. App. 27; *Wellman v. Wellman,* 191 Ill. App. 514.

But the error of the trial court, in my opinion, did not end here. I think it excluded proper and competent evidence that was offered in behalf of defendants. It is defendants' theory of the case that the order for the purchase of the Utility and Industrial stock was not conditioned upon the cancellation of the order for the Chicago Corporation shares, and upon that theory defendants had a right to show, if they could by competent evidence, that the order of plaintiff to cancel the purchase of the stock of the Chicago

Corporation was received by them too late to be made effective through the exercise of diligence on their part. To that end it was important for defendants to show, if they could, that the written notice mailed by them on August 5, 1929, and received by plaintiff on the 6th, which stated that the order for the purchase of the Chicago Corporation stock was canceled, had been sent out by mistake and inadvertence. If the confirmation was in fact mailed through a clerical error (and that is defendants' theory), it would seem that the legal effect of sending it would not be greater (in the absence of an estoppel which plaintiff disclaims) than the erroneous mailing by one person to another of a receipt for money. It has been held in well considered cases that under such circumstances the true facts may always be explained by parol evidence. *Paris v. Lewis,* 85 Ill. 597; *Starkweather v. Maginnis,* 196 Ill. 274; *Donner, Childs & Woods v. Sackett,* 251 Pa. 524, 97 Atl. 89; *Friedman & Co., Inc. v. Newman,* 255 N. Y. 340, 174 N. E. 703. There was a sharp conflict in the testimony of plaintiff and of Lundborg with regard to what had been stated about this alleged cancellation, plaintiff insisting that Lundborg had distinctly told him that the Chicago Corporation stock had not been purchased and that the order therefor had been canceled, while Lundborg testified that he only said that he did not think that the stock had been bought and that the stock was then marked up to 69. For the purpose of corroborating Lundborg's version of the transaction and for the purpose of showing due diligence on their part, defendants offered evidence tending to show the facts with reference to the actual purchase of this stock on the morning of August 5, 1929, on the floor of the stock exchange through the brokerage house of Mitchell, Hutchins & Co. Defendants produced as a witness the order clerk for defendants, who represented them on the floor of the

Chicago Stock Exchange, and proved that his duties there were the giving of orders received by him over the telephone from his firm to brokers on the floor for execution and the receiving of original reports of execution of trades of his firm from the brokers on the floor and reporting the same to his firm. He testified, identifying the execution slip in the handwriting of Shimmin, the expert specialist who handled the transaction, showing the purchase of the Chicago Corporation stock for plaintiff on August 5. It is in evidence as defendants' exhibit 6. The witness was asked by defendants' counsel when he first saw the document, from whom he received it, and what it was, as well as other questions tending to disclose the actual transaction and to prove facts which, if true, would show that it was impossible for defendants to make effective the attempted cancellation order which plaintiff gave. These questions were objected to by plaintiff, and the objections were sustained by the court.

There was much evidence of the same kind excluded. The court refused to let Lee, the order clerk for defendants, tell the time that he had 'phoned plaintiff's order, which was No. 242, to the floor of the Chicago Stock Exchange and to let the same witness tell what he said to another employee in telephoning the order there. The court refused to let Lee tell of a conversation he had with Lundborg on the morning of August 5 concerning the filling of plaintiff's order. This evidence was ruled out upon the theory that it was not admissible as not having been made in the presence of plaintiff. Conversations between Lee and Walter Tholl, the representative of defendants on the floor of the Chicago Stock Exchange, were also excluded, although defendants offered to show by Lee that when the order was received it was telephoned by him to Tholl and that the number of the order was given to Tholl as 242. Conversations between Tholl and Shim-

min, the specialist on the floor of the stock exchange, with reference to the transaction were also excluded. Defendants offered to prove by Lee that after the conversation with Tholl he placed the order in a box for cancellation and asked questions tending to disclose what the practice was in the office of defendants in handling such cancellation orders and how the notice was sent out to customers, but this was objected to by plaintiff and the objection was sustained by the court. Defendants then offered to show that after telephoning the cancellation order to their representative upon the floor of the stock exchange, Lee wrote a large letter ''C'' across the face of the order and placed it in the cancellation file; that under the regular practice of carrying on the business of that transaction, immediately after a cancellation order was entered the original order was taken out of the pouch where all open or unfilled orders were kept; that a large letter ''C'' was marked upon the orders to be canceled and were placed in the cancellation pouch; that these cancellations remained in this pouch until the end of the day when they were taken out by another employee and cancellation confirmations were prepared by defendants and mailed out to the customers. Defendants further offered to prove by this witness that after having been informed by Tholl that it was too late to cancel the purchase of 100 shares of Chicago Corporation stock he failed to take the order out of the cancellation bin and remove the letter ''C'' therefrom, and that it was due to his oversight in failing to do these things that the confirmation of the cancellation was prepared by other employees of defendants and mailed to plaintiff on the night of August 5, 1929. Plaintiff objected, and the objection was sustained by the court. Defendants then asked questions tending to disclose when Lee had first received notice of the price at which the 100 shares of Chicago Corporation had been bought for plaintiff's account and, upon objection,

offered to prove by the witness that he first learned of such price on the morning of August 6, 1929, and that he was then informed by Tholl that the order had been filled at $66 a share, but the plaintiff objected and the objection was sustained by the court.

Tholl was produced as a witness and questions asked him about the same matters were objected to, and the objections were sustained. The check of defendants to the order of Mitchell, Hutchins & Co. for the sum of $6,600, drawn on the Continental Illinois Bank & Trust Co., and marked as having been paid through the Chicago Clearing House, was offered and received in evidence. The right of defendants to submit evidence as to any acts which in fact took place with reference to the execution or cancellation of these orders and also as to any verbal statements or admissions which accompanied such acts, is established by the cases, and I do not understand that plaintiff in his brief contends otherwise. The cases which so hold are many and well considered. *Delaware & Hudson Canal Co. v. Mitchell,* 92 Ill. App. 577; *Prussian Nat. Ins. Co. v. Empire Catering Co.,* 113 Ill. App. 67; *Benedict v. Dakin,* 148 Ill. App. 301; *Michigan Cent. R. Co. v. Gougar,* 55 Ill. 503; *Matzenbaugh v. People,* 194 Ill. 108; *Hoffman v. Chicago Title & Trust Co.,* 198 Ill. 452; Greenleaf on Evidence, 16th ed., vol. 1, sec. 184-c; Jones on Evidence, 2nd ed., secs. 944, 952, 1235 and 1240. I think the court committed reversible error in excluding this evidence.

Defendants in their original brief in this court, anticipating the reply of plaintiff, argued quite fully that there was no estoppel of defendants to deny that plaintiff's order to purchase 100 shares of Chicago Corporation stock was canceled by defendants. They also pointed out that the issue of estoppel had not been raised by the pleadings of the case and therefore could not be urged. The brief of plaintiff replied in the following language:

"We confess our inability to understand Appellants' argument with reference to the so-called estoppel. There is no element of estoppel in this case. The pleadings set forth the claim of Appellee that he requested Appellants to buy for him 200 Utility & Industrial shares; that he tendered to them the amount remaining unpaid on account of such purchase and demanded their surrender, but that they refused to deliver such shares to him. . . . We are unable to follow Appellants' argument that in his declaration Appellee should have specifically pleaded an estoppel. *None is claimed, and liability is not predicated on an estoppel* but upon a conversion of Appellee's property."

Aside from the fact that the theory upon which a majority of the court decides this case is thus expressly disclaimed, it seems to me that the opinion overlooks the well settled law that the facts out of which an estoppel is alleged to arise must be established by a preponderance of the evidence (*Stanley v. Marshall*, 206 Ill. 20); that proof of such facts constituting a claim to estoppel must be of the clearest and most satisfactory character (*Preble v. Conger*, 66 Ill. 370); that where the complainant party relies on an estoppel as the basis of his claim, the alleged estoppel must be established by clear, precise and unequivocal evidence (*Coal Belt Elec. R. Co. v. Peabody Coal Co.*, 230 Ill. 164). The law, I think, is equally well settled that if a complaining party relies upon an estoppel to establish his case, he must specifically plead it; that if the matter of estoppel does not appear in the declaration, the plaintiff must, by a replication to the plea, expressly show such matter and that he relies thereon. *Smith v. Whitaker for use of Jonas*, 11 Ill. 417. That distinguished authority, Chitty on Pleading, states the rule (15 Amer. Ed., vol. 1, p. 603):

"If the matter of estoppel do not appear from the anterior pleading, the replication must expressly show

such matter and rely thereon and there must be an appropriate commencement and conclusion to the replication; or by replying an estoppel without relying upon it, the advantage of the estoppel as such may often be lost.'' At page 509 the same author says: ''Matter of estoppel should be specifically pleaded as such.''

I have set forth my views quite at length because of what I conceive to be the great importance of this case to this commercial community and because I think the theory upon which the majority opinion proceeds is fundamentally wrong.