THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD SYKES, Defendant-Appellant.

First District (1st Division)   No. 1—88—3456

Opinion filed December 30, 1991.

Randolph N. Stone, Public Defender, of Chicago (Stephanie L. Ellbogen, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Mary Brigid Kenney, and Theresa Harney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant Edward Sykes was convicted of robbery and sentenced to an extended term of 14 years. On appeal, defendant contends that: (1) the trial court erred in refusing to admit testimony from a State's witness on cross-examination that defendant filed an Office of Professional Standards complaint against his arresting officer; (2) defendant was denied a fair trial because the trial judge improperly assumed the role of the prosecutor in examining a defense witness; and (3) the trial court relied on an improper factor in sentencing defendant to an extended term of 14 years. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. At trial, Jason Anthony testified on behalf of the State that in June of 1988 he was a student living on the Evanston campus of Northwestern University. On June 16, he met his high school friend Darren

Cowitt at 12:30 a.m. and they headed toward the elevated tracks (the "L") to go to downtown Chicago for a party.

Anthony and Cowitt boarded the "L" at the Howard stop, and defendant sat down next to Anthony. Defendant commented that he liked Anthony's watch and asked Anthony at what stop he was getting off the train. Anthony replied that they were getting off at the Addison stop.

Anthony and Cowitt got off of the train at Addison. Defendant and Tommie Evans did the same. Defendant, who was in front of the boys on the stairs, turned around to face the boys and told them that the man behind them had a gun. Defendant advised them "don't do anything stupid, hand over the wallet and your watches."

Anthony handed his wallet and watch to defendant. Defendant searched his wallet then asked Anthony if he had any other money with him. Then defendant searched Anthony's body looking for money, and felt around Cowitt's neck for a gold chain. Evans took a gold chain and money from Cowitt, then defendant told them to turn around and they walked back up to the "L" platform. Defendant said he was going to "put both of [them] back on the train so [they] couldn't make a phone call."

Anthony and Cowitt sat down on a bench and waited for a train. Defendant stood on Anthony's left and Evans stood on Cowitt's right. Then Anthony saw a policeman walk up the steps. Defendant said, "Don't do anything stupid. Just sit still. Act calm. If you do anything, we will blow your heads off."

At that point Anthony stood up and yelled, "Help, we are being robbed." Defendant and Evans started to run. The officer caught Evans, and defendant jumped onto the "L" tracks and ran southbound along the tracks. Another policeman chased defendant. The first officer handcuffed Evans, searched him and recovered Cowitt's stolen property. Anthony stated that it was well lit at the "L" platform where they were robbed.

Anthony and Cowitt accompanied the officer and Evans to the police station where Anthony saw defendant. On cross-examination, Anthony stated that defendant was in front of them on the "L" stairs and that defendant did all the talking. Anthony was able to see defendant's face throughout the robbery.

Next, Officer Marvin Bonnstetter testified on behalf of the State that at approximately 1:35 a.m. on June 16, he and his partner, Tom Aquina, responded to a call that there was a robbery in progress at 940 West Addison on the "L" platform. Bonnstetter climbed the southbound stairs and at the top saw Anthony and Cowitt sitting on a

bench. Defendant and Evans were standing on either side of them a few feet away. As Bonnstetter walked toward them, Anthony stood up and yelled "Help, we are being robbed."

Defendant and Evans started to run. Bonnstetter grabbed Evans and defendant climbed down off the platform onto the tracks and ran southbound. Bonnstetter put Evans on the ground, and dispatched a call that a black male, 6 feet 3 inches, 180 pounds, wearing a green windbreaker was running down the tracks.

Darren Cowitt testified on behalf of the State to essentially the same facts as Anthony. Cowitt noted that when he and Anthony boarded the southbound "L" he took a seat facing east. Defendant was wearing a lime green coat. Cowitt told defendant they were getting off at Argyle, and Anthony said, "No, we are not. We are getting off at Addison." Then defendant wandered off down the "L" car.

Defendant was ahead of the boys as they descended the stairs. Defendant stopped at the landing and wouldn't let Cowitt and Anthony pass. Defendant turned around and asked them if he could have a "moment of their time." Cowitt said, "I am sorry, we are in a rush." Defendant said he was in a rush also. Defendant then asked Cowitt and Anthony to hand over their belongings. Cowitt and Anthony turned around to see if they could get up the stairs and at that point saw Evans. Evans had a bag under his arm. Defendant said that Evans had a gun.

Cowitt gave defendant his wallet, and defendant took the cash out and returned the wallet. Then defendant took Cowitt's gold chain and watch.

Defendant told the boys to go back up to the platform to wait for the next "L" train. On the platform, defendant told them to "sit quiet" and not to do anything "heroic or funny."

When Anthony yelled to the police officer, defendant said "get ready to jump onto the tracks," and Evans attempted to jump, but did not make it.

Next, Officer Don Eichler testified that on June 16, he responded to a call that an armed robbery was in progress at the Addison "L" station. Eichler saw defendant running southbound on the platform. The lighting condition was good.

After hearing a second broadcast that a male in a green coat was wanted for robbery, Eichler ran under the "L" tracks southbound, keeping defendant in sight above him on the tracks. At one point, defendant dove from the "L" tracks onto the landing of an adjacent building. Several times while he was running, defendant fell through the rungs of the "L" tracks. Eichler finally caught up with defendant

and handcuffed him in the middle of the tracks. Eichler called for assistance from the Chicago fire department, which carried them both off the tracks. Both Eichler and defendant were scratched and bruised. Eichler brought defendant into the police station, searched him and recovered a gold chain.

On cross-examination, Eichler testified that he did not push defendant down onto the track rungs and that he did not push his head into a railroad tie. Defense counsel asked Eichler if he knew what the letters "OPS" stood for on the police inventory sheet and Eichler said he did. Then defense counsel started questioning Eichler about the Office of Professional Standards. The State objected to defense counsel's line of questioning and the court sustained the objection.

At the end of testimony, the State rested and defendant's motion for directed verdict of acquittal was denied.

Tommie Evans then testified on behalf of defendant. Evans stated that he was with defendant on June 16. At 1:30 a.m., they were on their way to the south side of Chicago to "get some dope." When they were leaving the "L" train at the Addison stop, they saw two "average white men" and felt they would be easy victims to get the money they needed for drugs. When Anthony and Cowitt got off the train, Evans jumped up and grabbed the door. He indicated to defendant to get off behind him. As defendant left the train, Evans followed the men down the stairs.

Evans testified that Anthony and Cowitt were behind defendant and that he was behind them. When Evans got to the stairs, he announced he had a gun and that he wanted their money and their jewelry. Anthony and Cowitt stopped, turned around and looked at Evans and he said "start handing it over." Evans got cash, two watches and a gold chain.

Defendant ran up the stairs and Evans told Cowitt and Anthony to sit on a bench on the platform. Then Evans heard the police running up the stairs. As Evans was arrested, defendant jumped down on the tracks and started running.

Evans saw defendant later at the station. Defendant had on a green windbreaker and the front was covered with blood. Defendant was moaning and bleeding.

Evans told the police he committed the robbery because he was "on dope and was trying to get a fix." Evans pled guilty to the charge of robbery on September 13, 1988.

On cross-examination, Evans stated that he knew defendant and that they hung around and partied together. On June 16, Evans and

defendant had been riding the "L" train back and forth trying to "get some dope." Evans said that he never told defendant what to do or asked him to participate in the robbery. When the police caught Evans, he said defendant's name was Nathaniel Hill.

Evans further stated that he told OPS investigator Polito that the reason they were on the "L" platform was "we were doing wrong." Evans admitted that in June 1984 he was found guilty of retail theft and did time in the House of Corrections. He didn't remember what was taken from either Cowitt or Anthony because at the time of the robbery he was high on alcohol. Evans stated that defendant was sober at the time of the robbery. The police found two watches and a chain on Evans and took them from his pocket. On redirect, Evans testified that the saying "doing wrong" meant they were "going to get some dope."

Following the court's examination of the witness, defendant's motion for mistrial was denied, and the defense rested.

The jury found defendant guilty of robbery. After a sentencing hearing in aggravation and mitigation, the court sentenced defendant to 14 years, extended term. In making his decision, the trial judge considered that defendant had two prior convictions for armed robbery, one within 10 years of his conviction of this crime. The judge also took into consideration that defendant is a drug addict and that he lacks recognition of the need for drug rehabilitation and that defendant does not exhibit a readiness for drug treatment. The judge further found that the college students testified "clearly and convincingly that they were scared to death of this defendant," and that the crime was brutal and heinous.

Initially, defendant contends that he was deprived of his constitutional right to confront the witnesses against him. Defendant argues that the trial court erred in refusing testimony from Officer Eichler regarding the fact that defendant had filed an Office of Professional Standards (OPS) complaint against the arresting officer. During the cross-examination of Officer Eichler, defense counsel engaged in the following questioning:

"Q. Officer, you know what the letters OPS stand for; do you not?

A. Yes, sir.

Q. And that's Office of Professional Standards; is that correct?

A. Yes, sir.

Q. And that's a special section of the Chicago Police Department; isn't it?

A. Yes, sir.

Q. And they investigate, among other things, complaints that are filed by citizens regarding police brutality and other charges?

ASSISTANT STATES ATTORNEY: Objection, Judge.

THE COURT: Side bar."

In response, the State argues that such testimony was properly restricted as irrelevant to the present case. The State further argues that any error in restricting admission of the testimony was harmless.

Although a witness may be impeached by a showing of interest, bias, or motive to testify falsely, such evidence need not be admitted where it is remote or uncertain. (*People v. Testa* (1984), 125 Ill. App. 3d 1039, 1046, 466 N.E.2d 1126, 1132.) The latitude permitted on cross-examination is within the discretion of the trial court. (*People v. Jenkins* (1989), 190 Ill. App. 3d 115, 131, 545 N.E.2d 986.) As the scope of cross-examination rests largely within the sound discretion of the trial court (*People v. Hinton* (1984), 122 Ill. App. 3d 89, 95, 460 N.E.2d 791), a defendant seeking to reverse a trial court's decision must prove that the court clearly abused its discretion and that the abuse of discretion resulted in manifest prejudice to him. *Hinton*, 122 Ill. App. 3d at 95.

■ Defendant's reliance on *People v. Crosser* (1983), 117 Ill. App. 3d 24, 29-30, 452 N.E.2d 857, 862, is misplaced. The *Crosser* court held that when impeaching witnesses, defendants may raise the fact of a civil suit filed by the witness against the defendant. However, in the present case, the defendant is attempting to elicit testimony regarding his filing of an OPS complaint against Officer Eichler. Defendant cites no authority for the proposition that an OPS complaint should be treated in the same manner as a civil suit, accompanied by all the same safeguards and protections afforded a plaintiff in a civil suit. Other cases cited by defendant are both legally and factually distinguishable to the present case. The record further indicates that defendant was able to question Eichler on cross-examination regarding Eichler's actions at the time of arrest. Thus, defendant has failed to show that he was manifestly prejudiced by the court's refusal to admit the testimony.

Next, defendant contends that he was denied a fair trial because the trial judge improperly assumed the role of the prosecutor in examining witness Tommie Evans at trial. Defendant argues that the questions asked by the trial judge amounted to comments appropriate to closing argument and elicited evidence otherwise not adduced which helped to establish the State's case. In response, the State ar-

gues that the trial judge properly questioned Evans in order to clarify ambiguities in his testimony.

It is an abuse of discretion for the trial court to assume the role of an advocate. (*People v. Murray* (1990), 194 Ill. App. 3d 653, 551 N.E.2d 283; *People v. Galan* (1986), 151 Ill. App. 3d 481, 483, 502 N.E.2d 853.) The trial court may nevertheless question a witness " 'to elicit the truth or to bring enlightenment on material issues which seem obscure.' " (*Murray*, 194 Ill. App. 3d at 658, quoting *People v. Palmer* (1963), 27 Ill. 2d 311, 314, 189 N.E.2d 265; *People v. Wesley* (1959), 18 Ill. 2d 138, 163 N.E.2d 500.) But the court must question the witness "in a fair and impartial manner, without showing prejudice or bias against either party." (*People v. Gilbert* (1957), 12 Ill. 2d 410, 415, 147 N.E.2d 44, 47.) Whether the trial court's questioning is proper is determined by the circumstances of each case and rests largely in the discretion of the trial court. *People v. Trefonas* (1956), 9 Ill. 2d 92, 100, 136 N.E.2d 817; *People v. Marino* (1953), 414 Ill. 445, 450, 111 N.E.2d 534.

The trial court does not improperly assume the role of the prosecutor merely because its unbiased and impartial questions elicit evidence material to the State's case. (*Murray*, 194 Ill. App. 3d at 658.) To the contrary, "[i]t is the judge's duty to see that justice is done, and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice." (*People v. Franceschini* (1960), 20 Ill. 2d 126, 132, 169 N.E.2d 244; *People v. Bolton* (1927), 324 Ill. 322, 329, 155 N.E. 310; *People v. Lurie* (1917), 276 Ill. 630, 641, 115 N.E. 130.) Thus, the trial judge "may act to ensure that evidence essential to the proper disposition of a case is not inadvertently omitted." (*Galan*, 151 Ill. App. 3d at 483; *People v. Walter* (1980), 90 Ill. App. 3d 687, 688-89, 413 N.E.2d 542.) The only limitation to this rule is that the judge must not forget his function and "assume the function of the advocate." *Franceschini*, 20 Ill. 2d at 132.

In *Lurie*, the court reversed the defendant's conviction only because the judge "frame[d] his questions as to intimate [an] opinion as to the credibility of [the] witness[es]." (See *Lurie*, 276 Ill. at 641-42.) In *Franceschini*, the trial court properly advised the State, at the close of the evidence, that proof of breaking and entering was lacking, and properly allowed a State's witness to then testify to that material element of the charged offense. (See *Franceschini*, 20 Ill. 2d at 131-32.) Similarly, in *Bolton, Galan,* and *Walter*, the trial judges prop-

erly acted to ensure that evidence material to the prosecution was brought forth. In *Murray*, the court asked a witness whether anything was said during a struggle. The court held that the questioning was neutral and unbiased.

In the present case, the court engaged in the following examination of Evans:

"THE COURT: And did you see Mr. Sykes sit down next to these two average white boys?

MR. EVANS: Did I see?

THE COURT: Did you see him sit down and talk to the two white boys?

MR. EVANS: No. He was sitting down. Like they were sitting in a seat like—I think he was sitting across from them.

THE COURT: Is that when the thought originated in your mind that these would be two—

MR. EVANS: Yes. I looked at them and thought they might be.

THE COURT: What was it about these two gentleman [*sic*] that you thought they were easy marks?

MR. EVANS: Well—Well, okay, for one thing, I think one of them had—he had some money. Had white shirt on if I am not mistaken. And by the material being thin, I could see money being in the shirt pocket.

THE COURT: Had nothing to do with what they appeared?

MR. EVANS: They were kind of giggling. And I am thinking it would really make it easy for me to get this over with.

THE COURT: And while you were riding the "L" did you see Mr. Sykes sit down next to these gentlemen?

MR. EVANS: Yes. He was sitting not next to them. Like sitting next to me.

\* \* \*

THE COURT: So, now the two boys get off first. You say you held the door for them.

MR. EVANS: Right.

THE COURT: They—and suddenly, Mr. Sykes is in front of them walking down the stairs and you were behind them?

MR. EVANS: Yes.

THE COURT: Okay. How did that happen?

MR. EVANS: When I came off the train, he, you know, went straight down. And I told him to come on. He came off the doors and went downstairs.

THE COURT: Not knowing where he was going?

MR. EVANS: He knew—he guess—he imagine[d] we are going outside.

THE COURT: He imagined?

MR. EVANS: That we were going outside the turnstiles.

THE COURT: And you then announce that this is a stickup, I got a gun, don't do anything foolish?

MR. EVANS: Right.

THE COURT: Did he say don't do that? Did he try to help these two boys or try to stop you or tell you not to do that?

MR. EVANS: No.

THE COURT: He just walked past you, that's what what you are saying?

MR. EVANS: Just disassociated himself.

THE COURT: Disassociated himself."

■■ In the present case, the completely neutral questions asked of Evans did not exhibit any bias on the part of the trial court. The trial court here did not repeatedly interrogate or lead the witness as in *Lurie,* or intervene in the State's questioning, asking critical questions and supplying his own objections to defense counsel's questioning as in *People v. Moriarity* (1966), 33 Ill. 2d 606, 613-16, 213 N.E.2d 516, 520-21, relied on by defendant.

The cases relied on by defendant are inapposite. *People v. Santucci* (1962), 24 Ill. 2d 93, 180 N.E.2d 491, involved interrogations reflecting on the credibility of witnesses. Here, the questions put to defendant did not reflect on his credibility. *People v. Cofield* (1973), 9 Ill. App. 3d 1048, 293 N.E.2d 692, is distinguishable from the present case on the ground that the trial court there called and examined each of the State's witnesses, clearly assuming the role of the prosecutor. Therefore, we find that the court's examination does not provide grounds for a mistrial.

■■ Defendant further contends that the trial judge erred in denying a mistrial because he assumed the role of the prosecution in his advice to the State regarding the preparation of a jury instruction. Defendant fails to cite any authority to support this argument. This argument does not satisfy Illinois Supreme Court Rule 341(e)(7) (134 Ill. 2d 341(e)(7)) and does not merit further consideration on appeal.

Finally, defendant contends that the court relied on an improper factor in sentencing him to an extended term of 14 years for a robbery conviction.

Imposition of a sentence is a matter of judicial discretion and a sentence will not be disturbed absent a clear abuse of that discretion.

*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 547; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884.

In sentencing a defendant, the trial court may consider the gravity and circumstances of the offense, as well as defendant's mental capacity, age, demeanor and credibility. (*E.g., Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) Furthermore, the trial court must balance the objectives of protecting society and rehabilitating the defendant. (See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 866.) Once struck, a reviewing court will hesitate to upset this balance, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

■ The record in this case indicates that defendant was sentenced to a 14-year extended term of imprisonment, which is well within the statutory guidelines for a Class 2 felony such as robbery. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(4) (for a Class 2 felony, a term shall be not less than 7 years and not more than 14 years).) The record indicates that the court considered that defendant is an addict, that he lacks recognition of the need for drug rehabilitation and that he does not exhibit a readiness for drug treatment. The record also indicates that the court took into account that defendant has a GED high school equivalency degree, that he was occasionally employed as a musician, and that he had two prior felony convictions within the last 10 years. The court found the crime to be exceptionally brutal and heinous in that the college students testified "clearly and convincingly that they were scared to death of this defendant." Consequently, we conclude that defendant has failed to show that the trial court erred in sentencing him to an extended term of 14 years.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.