(No. 32655.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ARTHUR MARINO, Plaintiff in Error.

*Opinion filed March 23, 1953.*

EMMETT BYRNE, and FRANK FERLIC, both of Chicago, (J. D. GANNON, of counsel,) for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and ARTHUR MANNING, all of Chicago, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

On a trial before a jury in the criminal court of Cook County, Arthur Marino, the plaintiff in error, was found guilty of the murder of Joan Coward and sentenced to the penitentiary for a term of fifty years. He has sued out this writ of error and the record is here for review.

The deceased, seventeen years old, and the plaintiff in error, twenty-nine years old, had been acquainted for ten months and were engaged to be married. On the night of June 28, 1949, the deceased's birthday, plaintiff in error called at her home and the two went to a movie. After the movie they returned to deceased's home, where they stayed a few minutes, then left at 11:15 P.M. telling her parents that they were going dancing. The following morning, at approximately 5:00 A.M., plaintiff in error, in a seminude condition, drove his car in front of the police station at Riverdale, Illinois, and sounded his horn. A police officer came out and plaintiff in error pointed to the back seat of his car where the officer found Joan Coward. She was unconscious, was in a kneeling position, her clothing was disarranged and her face was badly swollen and bruised and covered with vomit. An inhalator squad was summoned but the girl expired before she could be revived, it later being determined that death was due to a skull fracture and hemorrhage and an accompanying asphyxia. When plaintiff in error was questioned he made motions to

his throat indicating that he could not talk and a cursory examination by a doctor at the police station revealed that his lips and inside of his mouth were burned. He wrote a statement of what had occurred, then later accompanied officers to the scene of the incidents he had written about. Following this he was hospitalized and later, two additional statements were taken from him.

The statements by plaintiff in error were exculpatory in nature and, briefly, their substance was as follows: After plaintiff in error and the deceased had stopped at several places seeking dance music, they were driving east on Sibley Boulevard, when a car with two men in it forced plaintiff in error to the curb. One man alighted and got on the running board of plaintiff in error's car and forced him to drive to nearby Victory Lake at the outskirts of Dolton, Illinois. At the lake, plaintiff in error was ordered to get out of the car and was asked for his money. One of the men remained with the deceased and the other man ordered plaintiff in error to walk to the lake shore some seventy feet away. At the shore, the man forced plaintiff in error to take two drinks of a liquid from a bottle, which he said burned him terribly, after which plaintiff in error was ordered to remove his clothes, except for his socks and shorts, and to walk out in the lake. Plaintiff in error complied, going out in the water until it was so deep that he was forced to tread water. The man then returned to the cars where he and his companion stayed for another forty-five minutes, all of which time plaintiff in error remained in the water. When the men finally drove off, plaintiff in error searched for his fiancee and, finding her hurt and unconscious, he put her in his car and drove to the police station.

Officers who searched the scene of the crime, found a partially filled bottle of ammonia. At the trial a witness for the prosecution identified plaintiff in error as the man who had purchased a bottle of ammonia in her grocery

store early in the evening of June 28, 1949. For their part, the defense introduced evidence which sought to discredit the testimony of the grocery store owner and, all through the trial, contended that there was no proof, medical or otherwise, that it was ammonia which had caused plaintiff in error's injuries. Another disputed point throughout the evidence was whether plaintiff in error had actually swallowed any of the caustic liquid or whether he had only taken it into his mouth.

The foregoing is but a brief summary of the evidence; its sufficiency is challenged here by plaintiff in error and defended by the People. However, in the view we take, that issue need not be determined on this appeal for it is our opinion that the judgment must be reversed because of improper and prejudicial conduct of the court during the course of the trial.

Plaintiff in error has detailed nine separate instances of the court's conduct which he interprets as being improper and prejudicial. One of these involves the testimony of Louis Panozzo, a Cook County constable, who testified as a witness for the defense with regard to a visit he had made to the grocery store where plaintiff in error allegedly purchased a bottle of ammonia. When the witness took the stand the following occurred:

"Court: What do you mean Cook County constable? Who appointed you?

Witness: Nobody. I was elected.

Court: You ran for constable.

Witness: Yes.

Court: Who elected you?

Witness: The voters of Worth Township.

Mr. Gentile: How many years have you been a constable?

Witness: I am now serving my fourth term, starting last April, four years for each term. I am on my 13th year."

Following these questions by the court, the witness was questioned by the defense counsel and told about his visit to the grocery store, after which the court questioned him as follows:

"Court: How did you happen to go there?

Witness: I drove in my car.

Court: For what reason?

Witness: I went over there to be there and witness when Marino was going to the store.

Court: Who arranged for you to do that?

Witness: The attorney.

Court: What attorney?

Witness: Gentile.

\* \* \*

Witness: I arrived there approximately 5:30. I parked about ten feet south of the store with my car. I got out of the car and as I was getting out of the car a lady with a small child approximately two years old walked by me and went in to the store ahead of me.

Court: *Had that been arranged too?* (Emphasis ours)

Witness: What? The lady you mean being there?

Court: Yes.

Witness: No, not that I know of. This lady was a stranger to me.

Court: What did Gentile tell you he wanted you to be there for?

Witness: To witness, to be a witness when Marino went in the store to see if the lady who was operating the store, or owned the store, which ever it might be, recognized him.

Court: You tell me what you did after you parked your car.

Witness: Well, after I got out of the car and started toward the store, I had been smoking a cigarette and I took a few more puffs and threw it away, and this woman

walked by and went in to the store, possibly three minutes or so before me, and I proceeded to go in the store then.

Court: How many puffs did you get off the cigarette?

Witness: Two puffs. Well it might have been six or seven, and then when I got in the store the lady who had gone in before me had completed her purchase. She had bought two articles, including a loaf of bread."

There were other instances during the examination of the witness, Panozzo, which we feel it is unnecessary to detail, wherein the court assumed the role of prosecutor and clearly displayed his disbelief of the witness. This attitude was culminated when the court made the statement: *"This is the most fantastic thing I ever listened to in all my life."* When plaintiff in error's counsel objected to the remark, the court replied: "You may object. It still is, Go ahead."

While the court has a wide discretion in the conduct of a trial, it must not invade the province of the jury by making comments, insinuations or suggestions indicative of belief or disbelief in the integrity or credibility of a witness. (*People v. Lurie,* 276 Ill. 630; *People v. Melnick,* 263 Ill. 24; *People v. Garines,* 314 Ill. 413.) In all criminal prosecutions, the accused persons, guilty or innocent, are entitled to a fair and impartial trial by jury. A fair trial contemplates that the jury will, alone, fulfill its duty of determining the facts, and it is not the province of the judge, in a criminal case, to express by word or indicate by conduct, in the jury's hearing, any opinion upon the facts. (*People v. Filipak,* 322 Ill. 546.) While it is true that a judge has a right to question witnesses or call other witnessses to the stand in order to elicit the truth or to bring enlightenment on material issues which seem obscure, he must do it in a fair and impartial manner, without showing bias or prejudice against either party. (*People v. Salerno,* 306 Ill. 570.) Jurors are ever watchful of the attitude of the trial judge and his influence upon them is necessarily

and properly of great weight, thus his lightest word or intimation is received with deference and may prove controlling. In a criminal trial, a hostile attitude toward an accused, or his witnesses, is very apt to influence the jury in arriving at its verdict.

In the present case, the witness Panozzo was testifying to a matter very material to the defense. The truth or falsity of that matter was strictly for the determination of the jury, yet we find the judge remarking to the witness: "Had that been arranged too?" and again, "This is the most fantastic thing I ever listened to in all my life." These remarks, accentuated by the judge's extensive sharp questioning and attitude toward the witness, clearly conveyed to the jurors the impression that the witness was not worthy of belief and that his story was false. The impression conveyed was necessarily prejudicial to the plaintiff in error.

Hostile conduct by the court toward an accused's counsel is another factor which may well tend to influence a jury to the prejudice of the accused. Considered in its entirety, the record here shows that the trial judge harbored a belittling and resentful attitude toward one of plaintiff in error's counsel throughout the trial, which was, on occasion, conveyed to the jury. For example, in one instance the attorney asked a question of a witness using the word "resonant." When the People objected to the question, the court replied: "If he can spell 'resonant,' spell it. You pronounce it correctly. Spell it." Later, the court ridiculed counsel's use of the word "droves" when he asked if cars were not "parked in droves." While perhaps not reversible error, the remarks quoted are indicative of the atmosphere which pervaded the trial.

The balance of the conduct of the trial court complained of occurred when various witnesses were being questioned about the nature of ammonia and its effect on the human body. When the subject first arose, the court interposed

a story that he had once taken a mouthful of ammonia by accident when he was a child, then, throughout the trial, frequently alluded to his experience, in some cases interrupting witnesses to do so. He also facetiously asked expert witnesses, at different times, why manufacturers called ammonia "Bo Peep" and remarked "It has something to do with sheep, doesn't it?" Again, remarks of the court, which were tantamount to testimony, emphasized to the jury that ammonia is a deadly poison and that it would be fatal to swallow it. The latter incursions into the realm of the jury were particularly harmful in view of the fact that the question of whether it was ammonia the plaintiff in error drank, and whether he swallowed the liquid, were controverted issues of fact. Without pausing to analyze the testimony and remarks of the court in these instances in complete detail, we conclude that many of them resulted in wrongful prejudice to plaintiff in error's cause. The entire record in these instances shows a basic lack of the decor that is anticipated in a fair and orderly trial.

It is essential that jury trials shall be managed fairly, and that trial judges shall not only be just to both sides, but that they shall conduct themselves in such a manner that an impartial state of mind is apparent to all concerned. In this case we are satisfied that the trial judge made statements and asked questions in such a manner as would almost certainly lead the jury to believe that he deemed the plaintiff in error guilty of murder and that he thought that the testimony of Panozzo was not worthy of belief. Such impressions conveyed to the jury by the presiding judge could not be otherwise than prejudicial to the plaintiff in error and his defense.

Where the evidence as to the guilt of the accused is close or doubtful, and the reviewing court, under the competent evidence, cannot say that regardless of abuses of discretion by the trial court, the jury could reach no other verdict than was found, then it is the duty of the court

of review to see that justice is properly administered and the accused given a fair trial. (*People* v. *Lurie*, 276 Ill. 630.) In this case the evidence of plaintiff in error's guilt was based almost exclusively on the interpretation of circumstances and upon alleged material discrepancies in his written statements. The evidence was close and plaintiff in error was on trial for his life and liberty. Under the evidence, we are not inclined to say that the jury would have reached the result it did, despite the indiscretions of the court. It is impossible to say, under the circumstances, that the accused has had his constitutional right of a fair and impartial trial. On this ground the judgment must be reversed and the cause remanded for a new trial.

*Reversed and remanded.*