(No. 36388.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK SANTUCCI, Plaintiff in Error.

*Opinion filed January 23, 1962.—Rehearing denied March 22, 1962.*

HARRY J. BUSCH, of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Defendant, Frank Santucci, was tried by a jury in the criminal court of Cook County, was found guilty of burglary and sentenced to the penitentiary for a term of not

less than five nor more than thirty years. He prosecutes this writ of error contending (1) that actions of the trial court denied him a fair and impartial trial; (2) that the jury was improperly instructed; and (3) that incompetent exhibits were introduced into evidence.

Sometime during the night of January 30-31, 1960, an office of the S. S. Kresge Co. located in a building at 5626 W. Belmont Avenue in Chicago was burglarized. All had been normal when the office was closed at 6:00 P.M. on January 30, but an employee called to the premises by the police at 5:00 A.M. the following morning testified that the cashier's cage was open and that the outer shell of the safe had been removed. Nothing had been taken, but two acetylene torches, a radio and a bag of tools were found near the safe.

At about 3:00 A.M. on January 31, a Sunday morning, police officer Alvin Troc was at the rear of the building housing the Kresge office where he heard pounding and a radio tuned in to police calls. Detailing his action, Troc testified that he went to the nearest call box where he encountered another officer, Francis Size, and that the two then returned to the rear of the building. As they did so, they crossed through a parking lot which was adjacent to the rear of the building and across the street from a tavern known as Bell's Lounge. Upon their arrival at the rear of the building they noted a single stairway leading to the top floor of the building and a passageway leading to the stairs. The stairway, which was to the east of the portion of the building occupied by the Kresge office, was enclosed with chicken wire and had a door at its base that was closed and locked with a spring lock. Being unable to find a way into the building, Troc returned to the call box to summon additional help and remained away for about six minutes, while Size stayed at the building. As Troc was returning he heard an automobile horn blowing and then a shot. Upon arriving at the rear of the building he saw officer

Size with a man in custody, and watched as the man unlocked the door to let himself out of the stairway. The man was the defendant. At the conclusion of Troc's cross-examination, the court asked the witness a series of questions which re-emphasized that defendant was locked inside the stairway.

Officer Size testified that as he was standing at the rear of the building an automobile came down the street with its horn blowing. A few minutes later, he observed three men run across the roof of the building and jump from the roof to the stairway. Size shouted for the men to halt but, instead, they turned around and ran back up the stairs. At this, the officer fired a shot. Two of the men continued back onto the roof and escaped, but one, the defendant, walked down the stairs, gave himself up and let himself out through the stairway door. Size said he asked defendant what he was doing there but received no response. Again, during the cross-examination of this witness, the court interposed question which emphasized that the three men on the roof had come down the stairway.

Later, Size had occasion to go to the Kresge office and found acetylene torches, hammers, chisels and a radio that was tuned in to police calls and still operating.

The first witness for the defense was Paula Galinski, a resident of Florida. She testified in substance that on January 31, 1960, she was married, but separated, and that she was then employed in Chicago as a receptionist. She had been acquainted with defendant for about a week and at about 9:30 on the night of January 30 had driven her car and met defendant at a steak house where they remained until about 1:00 A.M. At the suggestion of the witness they went next to Bell's Lounge and had drinks until the place closed at 3:00 A.M. When they left Bell's they went across the street to where the witness' car was in a parking lot and, while she was warming up the car, defendant excused himself, said he would be right back and then walked

around the corner of a building the car was facing. She next saw him about two minutes later as he came around the corner with his hands up, and with a policeman standing in back of him. The witness said there were about eight or nine couples going to their cars at the time, that she didn't know what to do and didn't want to become involved in anything, so she drove away and went home after calling a friend of defendant's at the steak house and informing him of what had occurred. The court likewise interrogated this witness, both at the close of direct and cross-examination, the substance of the latter instance being as follows:

"Court: Mrs. Galinski, I want to clear up a matter in my notes. At this time in January you were separated from your husband?

Answer: Yes, I was.

Court: Where was he living at that time?

Answer: He was living in Florida.

Court: Then I was mistaken when I wrote down here, you said that after you saw the defendant in custody of the police you got in the car and left to meet your husband; you meant to go back and meet your children.

Answer: No. I did go home, but first I went and made a phone call.

Court: You didn't leave to meet your husband that evening?

Answer: No.

Court: That is what I wanted to clear up."

Defendant testified in his own behalf and reiterated the details of his acquaintance with Paula Galinski and how they had been together from about 9:00 P.M. to 3:00 A.M. on the night in question. Describing the events in the parking lot across from the Bell Lounge, he testified that he excused himself, and walked into a little alcove out of the sight of the automobile to answer a call of nature. He said that as he was urinating he saw a policeman and two fellows

running from the stairway toward the alcove, that the officer fired a shot and fell down and the other two fellows ran away. By defendant's version, the officer then pointed the gun at him, ordered him to put his hands against the wall and searched him. Following this, according to defendant, the officer made him walk over to the stairway and made him remain there until a squad car arrived. He denied that he had been on the stairs before. After defendant had been cross-examined, the court examined him extensively concerning where the two men had come from and where they had gone, and as to whether the officer made him go into the stairs or only to the doorway.

In all criminal prosecutions the accused person, guilty or innocent, is entitled to a fair and impartial trial by a jury. (*People* v. *Berardi*, 321 Ill. 47; *People* v. *Black*, 317 Ill. 603.) Ultimate decisions of fact must fairly be left to the jury, as must be the determination of the credibility of witnesses and the weight to be afforded their testimony, and to this end it is not the province of the judge, in a criminal case, to convey his opinions on such matters to the jurors by word or deed. (*People* v. *Garines*, 314 Ill. 413; *People* v. *Finn*, 17 Ill.2d 614.) As pointed out on numerous occasions, jurors are ever watchful of the attitude of the judge, and any disclosure of disbelief or hostility on his part is very apt to influence them in arriving at their verdict. (*People* v. *Coli*, 2 Ill.2d 186; *People* v. *Marino*, 414 Ill. 445; *People* v. *Filipak*, 322 Ill. 546.) At the same time we recognize that a trial judge is not a mere moderator or referee but may, at any time, ask questions for the purpose of eliciting the truth, provided he conducts himself so as not to give the jury any impression of his feelings. (*People* v. *Smith*, 18 Ill.2d 547.) This does not mean, however, that a judge is warranted in conducting an extensive examination of witnesses, for to do so is to usurp the function of counsel, and to give undue prominence to the matters gone into by the

judge. *People* v. *Pelletri,* 323 Ill. 176; *People* v. *Schultz,* 300 Ill. 601; *Dunn* v. *People,* 172 Ill. 582.

The question of defendant's guilt or innocence in this case rested almost completely with the jurors' choice of which witnesses they would believe and, under such circumstance, it was incumbent upon the court to refrain from influencing the jury in any way. Yet we find that the court interrogated each and every witness who testified, in some instances causing reiteration and emphasis upon testimony which pointed to guilt and, in another, casting discredit upon Paula Galinski, a key witness for the defense. While the court said he was questioning Mrs. Galinski in order "to clear up a matter in my notes," the whole of his interrogation did no more than to bring out that she was a married woman who had nonetheless gone out with defendant on the night in question. The witness had already testified to these facts on direct examination, and the matter was of importance only so far as it affected the credibility of the witness in the minds of the jurors. Such a line of repetitive questioning, we believe, could not fail to have an effect on the jury's reaction to the witness and to the credibility of her testimony. In addition, on several occasions during the trial and in the presence of the jury, the court's remarks to defense counsel were of such a nature as to show impatience, if not hostility, to the manner in which the defense was conducted.

Considering the persistent interrogation of witnesses by the court, most particularly that directed to Mrs. Galinski, together with the comments to defense counsel in the course of trial, we are of the opinion that the court exerted an influence which fatally infected the trial. Nobody knows what the jury would have done had it been free from such influence and we believe substantial justice can be done only by according defendant a new trial.

Since a new trial is necessary, at which the errors in

instructions complained of may not recur, the only other assignment of error that need by considered is the contention that the court erred in admitting into evidence the burglar tools and equipment found near the Kresge safe. We have held that burglar tools found in a building in which an accused was caught, or from which he fled, are competently received in evidence. (*People* v. *Stanton,* 16 Ill.2d 459, 469; *People* v. *Panczko,* 381 Ill. 625, 633.) Here there was evidence that defendant was caught fleeing from the burglarized premises and, such being the case, the burglar tools were competent evidence against him. The case of *People* v. *Fontana,* 356 Ill. 461, upon which defendant chiefly relies, is distinguishable on its facts. There no person saw the accused enter or leave the building which had been burglarized, and in which the burglar tools had been found.

For the reason stated, the judgment of the criminal court of Cook County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*