THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANDRE KELLEY a/k/a Andre Kelly, Defendant-Appellant.

First District (3rd Division)   No. 81—1462

Opinion filed March 30, 1983.

Dale L. Smirl and John T. Kennedy, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joel A. Stein, and Barbara A. Levin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:
Following a jury trial, defendant, Andre Kelley, was found guilty

of the murder and attempted armed robbery of Charles Lawson and was sentenced to a term of imprisonment of natural life. On appeal, he contends: that an improper remark of the trial judge deprived him of a fair trial; that testimony and evidence of other crimes were improperly admitted into evidence at his trial; that the jury instruction on evidence of other crimes was overly broad; and that his motion to suppress certain physical evidence and his statement should have been granted because the police lacked probable cause to stop the taxicab in which he was a passenger.

At trial, the oral statement that defendant made shortly after his arrest on June 4, 1980, to Assistant State's Attorney Elaine Geer was admitted into evidence. Geer testified that defendant stated: that he was riding in the back of Lawson's cab near 64th Street; that he told Lawson to turn into an alley; that he pulled his gun and said, "This is a stick-up"; that after they turned into the alley, he saw an automobile blinking its headlights; that he told Lawson, "Move"; that Lawson proceeded to the mouth of the alley, where defendant told him to make a left turn; that Lawson would not turn; that he then shot Lawson behind the ear; that he left the cab and went to his home, approximately one-half block away at 6522 South Hermitage Street; and that the gun the police found at the time of his arrest was the gun used in the shooting.

Defendant's confession was corroborated by George Branch. He testified that while driving his automobile at approximately 2:30 a.m. on June 3, 1980, he observed a cab in an alley near Hermitage and 64th Streets. He thought that this was unusual because he used to be a cabdriver and because he knew that a cab should not be in an alley. Branch sounded his horn, and when the cab drove down the alley in a southerly direction, Branch followed it, blinking his bright lights and honking his horn. When the cab stopped in the alley at 66th Street, Branch hesitated for approximately 30 seconds. He then drove past the cab and saw the cabdriver in the front seat, slumped over the steering wheel. The left rear door of the cab was open, but Branch did not see anyone else in the vicinity. Subsequently, he directed a police officer to the location of the cab. Chicago police officer Henry Jackson testified that at approximately 2:30 a.m. on June 3, 1980, he and his partner followed the driver of an automobile to a location on 66th Street between Hermitage and Wood Streets. He observed a cab facing southbound in the alley with the left rear door open. When he approached the cab, he saw that the driver was leaning over the steering wheel. The driver was moaning, and there was blood running down his collar. Testimony of Charles Lawson's mother established

that he died on June 10, 1980. Dr. Robert Stein testified that on June 11, 1980, he performed an autopsy on the body of Charles Lawson, and that in his opinion, the cause of Lawson's death was a bullet wound to the head. There was an entrance bullet wound located on the back of the head which had the characteristics of a contact wound, and during an internal examination, a bullet was recovered.

Chicago police officer James Spratte testified that during the early morning hours of June 4, 1980, he and his partner were investigating a pattern in a series of robberies which had occurred within an eight or nine square block area, and that they were stopping all cabs they saw driving on side streets in that area to warn the drivers of the pattern and to look at the passengers to see if they fit a description. At approximately 3:30 a.m., they stopped a cab near 64th Street and spoke to the cabdriver, informing him of the robberies and shootings in the area. Spratte then looked in the rear of the cab and saw two passengers, one of whom was defendant. Defendant was ordered out of the cab and was arrested. Spratte then observed that the other passenger in the cab, a woman, had her hands in the pockets of her coat. The officers asked her to remove her hands from her pockets, and they observed the butt of a revolver. They seized the gun, asked her to exit the cab, and placed her under arrest. Spratte identified the gun as a Smith and Wesson .38-caliber, nickel-plated revolver. Donald Smith, a firearms examiner for the Chicago police department, testified that in his opinion the bullet recovered at the autopsy had been fired from the revolver seized at the time of defendant's arrest.

There was also evidence of similar offenses committed by defendant. Homer Wilcox testified: that he was a cabdriver; that at 4:30 a.m. on June 2, 1980, he picked up defendant near the corner of 63rd and Ashland Streets; that defendant said he wanted to go to 66th and Honore streets, about seven blocks away; that when they got to 66th and Paulina streets, defendant told Wilcox to stop the cab; that Wilcox did so, and when he looked in the rear of the cab, he saw that defendant had a gun; that defendant said, "Stickup," and with both hands pointed the gun at Wilcox' temple; that the gun had a chrome barrel and was similar to the revolver subsequently recovered by the police; that defendant told Wilcox to drive into a nearby alley; that defendant struck Wilcox on the top of his head with the gun; that in an attempt to escape, Wilcox stepped on the cab's accelerator and crashed into another car; that as Wilcox accelerated, defendant shot him through the nose; that when Wilcox exited the cab, defendant shot him in the arm; and that he ran and was subsequently taken to a hospital by police. Chicago police officer Andrew Brooks, an evidence

technician, testified that at 5:20 a.m. on June 2, 1980, he and his partner examined the interior of the cab and found a fired bullet in the front seat. They also examined the cab for latent fingerprints and found four of them. Brooks lifted the fingerprints, one of which was lifted from the inside right rear door handle of the cab. Chicago police officer Phillip Montalbano, a latent fingerprint examiner, testified that in his opinion that latent fingerprint from the door handle matched a fingerprint on defendant's fingerprint card. Ernest Warner, a firearms examiner for the Chicago police department, testified that in his opinion the bullet recovered from Wilcox' cab had been fired from the gun recovered at the time of defendant's arrest.

John Watts, a cabdriver, testified: that at 6 a.m. on June 2, 1980, he was driving his cab; that at 63rd and Ashland streets, he picked up defendant, who said his destination was 65th and Laflin streets, a short distance away; that as they approached Laflin Street, defendant told Watts to turn it into the alley; that he turned around and saw that defendant was holding a pistol with both hands; that the pistol was pointed at the back of his head; that he turned into the alley and stopped; that he was robbed there; that he exited the cab and walked away as defendant ordered him to do; that when he was 10 to 20 yards away, the cab was driven away in the opposite direction; and that he walked to a police station where he informed officers of the robbery. Chicago police officer Robert White testified that at 6 a.m. on June 2, 1980, he received a radio message of an accident in an alley near 6434 South Hermitage Street, that he observed a vehicle in the alley that had struck a post, and that the accident occurred 1½ blocks from 6522 South Hermitage Street, defendant's address. The vehicle he observed was Watts' cab.

I

Defendant first contends that an improper remark of the trial judge made to the prospective jurors prior to *voir dire* examination deprived him of a fair trial. The remark was:

"The defendant is charged by way of an indictment. The indictment charges that on or about June 3rd 1980, within the County of Cook, the defendant herein, namely Andre Kelley committed the offense of murder in that he intentionally, knowingly, shot and killed one, Charles Lawson, with a gun.

He is also charged at the same time, at the same place, he did commit the offense of attempt robbery in that he did attempt to take the property from the person and presence of one, Charles Lawson, while armed with a dangerous weapon,

to-wit, a gun.

In other words, the defendant here is charged with the crime of attempt armed robbery and murder. *And basically I believe the facts will bear out here that the defendant at the time the State charges and alleges that, that the defendant here attempted to rob a cab driver, and during the course of the robbery, that attempt armed robbery, shot and killed Charles Lawson.*" (Emphasis added.)

Immediately following this statement, the trial judge correctly commented that the defendant is presumed to be innocent and that the State has the burden to prove him guilty beyond a reasonable doubt. According to defendant, the trial judge's remark reduced his right to a jury trial to an empty, *pro forma* exercise, because the jury had been told prior to the presentation of any evidence that defendant had committed the offenses with which he was charged.

Initially, the State responds that defendant has waived consideration of this issue on appeal because he did not make an objection to the remark at trial and because he failed to raise this issue in his motion for a new trial. Although the failure to make a proper and timely objection or to specify objectionable matter in the motion for a new trial ordinarily prohibits review, our supreme court has held that a less rigid application of the waiver rule must prevail where misconduct of the trial judge is involved. *People v. Tyner* (1964), 30 Ill. 2d 101, 105, 195 N.E.2d 675; *People v. Sprinkle* (1963), 27 Ill. 2d 398, 399, 401, 189 N.E.2d 295.

Moreover, the plain error doctrine provides a reviewing court with discretion to take notice of plain errors or defects affecting substantial rights, although they were not brought to the attention of the trial court. (87 Ill. 2d R. 615(a).) That doctrine "may be invoked in criminal cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial." (*People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091.) And the plain error rule serves two distinct purposes. First, it affords certain protections to the accused, by correcting serious injustices. Secondly, it protects and preserves "the integrity and reputation of the judicial process." *People v. Baynes* (1981), 88 Ill. 2d 225, 230-31, 430 N.E.2d 1070.

In the instant case, the evidence was not so closely balanced as to require us to reach the substance of the complained of error under the first part of the plain error test. (See *People v. Baynes* (1981), 88 Ill. 2d 225, 233.) We do, however, believe that it is necessary to review the alleged error under the second part of the test. In our opin-

ion, the alleged error is so fundamental that consideration of it is necessary to protect and preserve the integrity and reputation of the judicial process. (*People v. Baynes* (1981), 88 Ill. 2d 225, 233-34.) In this regard, we note that in *People v. Jenkins* (1980), 89 Ill. App. 3d 395, 397-98, 411 N.E.2d 1047, this court utilized the plain-error doctrine to hold that reversible error was committed when the trial court improperly attempted to explain the meaning of reasonable doubt to the jury venire.

The accused in a criminal prosecution, whether guilty or innocent, is entitled to a fair and impartial trial by jury. (*People v. Santucci* (1962), 24 Ill. 2d 93, 98, 180 N.E.2d 491; *People v. Marino* (1953), 414 Ill. 445, 450, 111 N.E.2d 534.) In other words, the defendant has a "constitutional right to have his case heard and determined by a jury of impartial individuals free from influence or intimation by the trial court as to the guilt of the defendant." (*People v. Sprinkle* (1963), 27 Ill. 2d 398, 402.) Thus, "it is not the province of the judge, in a criminal case, to express by word or indicate by conduct, in the jury's hearing, any opinion upon the facts." (*People v. Marino* (1953), 414 Ill. 445, 450; see *People v. Santucci* (1962), 24 Ill. 2d 93, 98.) Rather, "[u]ltimate decisions of fact must fairly be left to the jury." (24 Ill. 2d 93, 98.) In this regard, we note that expressions of opinion by a trial judge are liable to have great weight with the jury. (*People v. Bernstein* (1911), 250 Ill. 63, 67, 95 N.E. 50.) Our supreme court has stated:

> "Jurors are ever watchful of the attitude of the trial judge and his influence upon them is necessarily and properly of great weight, thus his lightest word or intimation is received with deference and may prove controlling." *People v. Marino* (1953), 414 Ill. 445, 450-51; see *People v. Santucci* (1962), 24 Ill. 2d 93, 98.

■ The trial judge in the instant case stated, in effect, that he believed that the evidence at trial would show that defendant attempted to rob, and that defendant killed Charles Lawson. We are of the opinion that such a remark impinges upon the integrity of our judicial system. Because of the potential impact and substantial influence that the trial judge's statement may have had upon the jury, we hold that defendant is entitled to a new trial.

The State argues that defendant was not prejudiced by the trial judge's remark to the prospective jurors. First, the State contends that the remark was inadvertent. Even conceding that the remark was not intentional, our concern is not the intent of the trial judge, but the effect his words had on the prospective jurors. (See *People v.*

*Timms* (1978), 59 Ill. App. 3d 129, 137, 375 N.E.2d 1321.) Moreover, in the trial judge's comments to the jury immediately prior to the complained of remark, he stated that defendant was charged with murder and attempted armed robbery. Then he stated, "I believe the facts will bear out \*\*\*." The prospective jurors, at this point, could have believed that the trial judge had completed his explanation of the charges in the indictment and that the trial judge was stating his opinion of what the evidence at trial would show. And as we have already stated, expressions of opinion by a trial judge are liable to have great weight with the jury.

Secondly, the State contends that any error was cured by the trial judge's comments on the presumption of innocence following the complained of remark and by giving to the jury Illinois Pattern Jury Instruction (IPI), Criminal, No. 2.03 (1968) on the presumption of innocence at the conclusion of the evidence. Although we agree with the State that defendant's trial must be considered as a whole (*People v. Lombardi* (1973), 13 Ill. App. 3d 754, 762, 301 N.E.2d 70), the comments and the instruction did not correct any potential impression of the jurors that the trial judge believed that the evidence would show that defendant was guilty of the offenses charged. We also observe, however, that the jury was given IPI Criminal No. 1.01, which states, *inter alia*: "Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." We do not believe that this jury instruction, by itself, was sufficient to correct the error here.

Lastly, the State contends that any prejudice resulting from the trial judge's remark was diminished because it occurred before *voir dire.* The State relies on *People v. Friday* (1973), 11 Ill. App. 3d 1071, 1074-75, 297 N.E.2d 218, where the appellate court held that an inadvertent misstatement by the trial court that the presumption of innocence does not aid a guilty person did not constitute prejudicial error, "particularly in view of the fact that this was in the *voir dire* examination." The trial judge in the instant case, however, stated an opinion as to what the facts would show. Since the trial judge's remark concerning what the evidence would show occurred before the jury was empaneled and before any evidence was heard, the jurors eventually empaneled may have heard the evidence from a perspective different from the one they would have had if the remark had not been made.

Finally, although neither party cited *People v. White* (1977), 48 Ill. App. 3d 907, 363 N.E.2d 408, in its brief, we feel that that case must be distinguished from the instant case. In that case the trial judge at

the commencement of *voir dire* made the following statement to prospective jurors:

"The defendant, Dennis White, is charged in an indictment with the crime of armed robbery. The offense is alleged to have taken place in the early morning hours of January 16, 1975, behind a residence in Waukegan when Dennis White did take money and one pair of shoes from Bartley Nicholson by use of force and while armed with a knife." (48 Ill. App. 3d 907, 912-13.)

The appellate court stated: "The foregoing cannot be considered as an expression or opinion of guilty by the [trial] court." (48 Ill. App. 3d 907, 913.) We cannot conclude that the remark in the instant case is capable of an innocent construction.

In sum, we conclude that the trial judge's remark requires that the cause be remanded for a new trial. This result is necessary to protect and preserve the integrity and reputation of the judicial process.

II

Since the other issues raised by this appeal may recur at a new trial, we also consider them.

Defendant's second contention is that the trial court erred in admitting evidence of other crimes: the attempted armed robbery and shooting of Wilcox and the armed robbery of Watts. Generally, evidence of offenses other than the one for which the accused is being tried is not admissible; however, such evidence is admissible if relevant for any purpose other than to show propensity to commit a crime. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.) Thus, "evidence which goes to show motive, intent, identity, absence of mistake or *modus operandi* is admissible though it may show the commission of a separate offense." (62 Ill. 2d 448, 455.) The State contends that the evidence of the other offenses was properly admitted into evidence at the defendant's trial to show *modus operandi* and, thus, identity.

Recently, our supreme court stated that evidence of a separate offense is "relevant and admissible as proof of *modus operandi* only upon a strong and persuasive showing of similarity." (*People v. Tate* (1981), 87 Ill. 2d 134, 141, 429 N.E.2d 470.) The similarities between the two offenses being compared need not be unique; however, "there must be present some distinctive features that are not common to most offenses of that type in order to demonstrate *modus operandi*." 87 Ill. 2d 134, 142-43.

Here, we believe there was a substantial and meaningful link

between the offense for which defendant was on trial and the respective offenses against Wilcox and Watts. (See *People v. Tate* (1981), 87 Ill. 2d 134, 143.) Each offense involved the armed robbery or attempted armed robbery of a cabdriver. All three offenses occurred during the early morning hours. The offense for which defendant was on trial occurred on June 3, 1980. The other two occurred on June 2, 1980. All were committed within an eight or nine square block area, and defendant lived nearby. Each of the three cabdriver victims was told to drive into an alley. In each of the other offenses, defendant used a handgun which he pointed at the cabdriver's head; in the offense for which defendant was on trial, the victim died from a bullet wound to the head and the bullet was fired from a handgun. While no one of these common features would be sufficient to justify the admission of the evidence of the other offenses on a theory of *modus operandi*, we are of the opinion that these features, when viewed in combination, are sufficient to show the requisite similarity. Moreover, in both the offense against Lawson and the offense against Wilcox, there was evidence that the same gun was used. Further, the victim of each offense was shot in the head.

We conclude that evidence of the other offenses is admissible at a new trial. In our opinion, the probative value of this evidence outweighs its prejudicial impact. See *People v. Connors* (1980), 82 Ill. App. 3d 312, 317, 402 N.E.2d 773.

Defendant also contends that the evidence of the other crimes at trial was excessive, and specifically refers to the testimony of witnesses White, Brooks, Montalbano and Warner. Furthermore, he contends that it was error to admit certain physical evidence connected with the other crimes, including the bullet recovered from Wilcox' cab and the fingerprint lifts from his cab. We disagree. The complained of evidence of the other offenses was admissible because it tended to establish that the other offenses were committed by defendant and that the *modus operandi* exception to the other offenses rule was applicable. Defendant suggests, however, that the prejudicial impact of this evidence outweighs its probative value, because this evidence only buttressed the testimony of Wilcox and Watts, the victims of the other offenses. We, however, are of the opinion that the prosecution should not be limited to the testimony of a victim of the other crime in its attempt to show that another similar crime occurred and that defendant committed it.

### III

Thirdly, defendant contends that the jury instruction on evidence

of other crimes was prejudicial because it invited overly broad use of such evidence. The complained of instruction is based upon IPI Criminal No. 3.14, and it states:

"Evidence has been received that the defendant has been involved in crimes other than that charged in the indictment. This evidence has been received solely on the issue of the defendant's identification, presence, intent, motive and design. This evidence is to be considered by you only for the limited purpose for which it was received."[1]

Defendant made no objection to this instruction at trial, but now contends that certain exceptions to the other offenses rule enumerated in the instruction should have been deleted. He apparently concedes that the evidence of other crimes, if admissible, was probative of his design, motive, and intent, but he argues that such evidence was not probative of his identification and presence. We find his argument somewhat confusing, but observe that he will be able to raise this issue at a new trial.

## IV

Lastly, defendant contends that the trial court should have granted his motion to suppress certain physical evidence and his statement because the arresting officer did not have probable cause to stop the cab in which defendant was a passenger.

At the hearing on his motion to suppress, defendant testified that at 3:30 a.m. on June 4, 1980, police officers stopped the cab in which he and a woman were passengers; that the stop occurred near 64th and Wood Streets; and that the officers asked him to exit the cab, searched him, and placed him under arrest. The only witness produced by the prosecution at the hearing on the motion was Officer Spratte. His testimony was similar to his trial testimony. On June 4, 1980, he was aware of three offenses that had occurred on June 2 and 3, 1980. Two victims had described their assailant as a darkly complected black male, approximately 20 years old, 5 feet 6 inches to 5 feet 7 inches tall, weighing 140 pounds. One of the victims further described his assailant as having smooth skin and a gold earring in his right ear. Spratte also knew that all three offenses had occurred in the same area. The second offense of June 2, 1980, occurred approximately four city blocks from the first offense on that date, and the offense on June 3, 1980, occurred approximately one block west

---

[1]We note that IPI Criminal No. 3.14 has been modified to refer to "offenses," not "crimes." See IPI Criminal No. 3.14 (2d ed. 1981).

of the first offense on June 2 and approximately 1½ blocks south and four blocks west of the second offense. At approximately 3:30 a.m., Spratte and his partner stopped a cab at 6433 South Wood Street. They asked the cabdriver to exit his vehicle and told him about the offenses in the area. When Spratte looked in the rear window of the cab, he observed defendant and a woman. He observed that defendant possessed the physical characteristics of the assailant described by the cabdriver victims. Spratte also had a composite sketch of the assailant that he kept in his vehicle. He arrested defendant on the basis of the description and the composite drawing.

The stopping of an automobile and the detention of its occupants constitute a "seizure" within the meaning of the fourth and fourteenth amendments of the Federal Constitution. (*Delaware v. Prouse* (1979), 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391; *People v. Brand* (1979), 71 Ill. App. 3d 698, 699-700, 390 N.E.2d 65.) In *Prouse*, the United States Supreme Court held that stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the fourth amendment, unless there is at least an articulable suspicion that the motorist is unlicensed or that the automobile is not registered, or either the vehicle or an occupant thereof is otherwise subject to seizure for violation of a law. (*Delaware v. Prouse* (1979), 440 U.S. 648, 663, 59 L. Ed. 2d 660, 673, 99 S. Ct. 1391, 1401.) The court specifically noted, however, that the questioning of all oncoming traffic at roadblock-type stops is a permissible alternative to the discretionary, random stop prohibited in that case. (440 U.S. 648, 663, 59 L. Ed. 2d 660, 673-74, 99 S. Ct. 1391, 1401.) In reaching these conclusions the court stated:

"[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.' [Citations.]" 440 U.S. 648, 654-55, 59 L. Ed. 2d 660, 667-68, 99 S. Ct. 1391, 1396-97.

In *People v. Meitz* (1981), 95 Ill. App. 3d 1033, 420 N.E.2d 1033, the appellate court applied this balancing of interests approach to a fact situation somewhat similar to the instant case. In that case, an officer was charged with investigating a series of automobile thefts from a particular parking lot. Eighty-five percent of the stolen automobiles were late model General Motors vehicles, and the officer was instructed to perform a registration check on all late model General Motors vehicles exiting the parking lot during the hours of the day in which thefts had occurred. Pursuant to these orders, the officer stopped an automobile driven by the defendant. The appellate court held that the stopping of the automobile did not unreasonably infringe upon the defendant's fourth and fourteenth amendment rights because "[t]he governmental interest in stopping a series of automobile thefts occurring from this one particular parking lot outweighs this minimal intrusion into the defendant's fourth amendment rights." (95 Ill. App. 3d 1033, 1037.) The stop did not involve the unconstrained exercise of discretion by the police officer, but rather occurred pursuant to specific guidelines and procedures. 95 Ill. App. 3d 1033, 1038-39.

We believe that the governmental interests in stopping all cabs within the eight or nine square block area justified the stopping of the cab in which defendant was a passenger. First, the government had an interest in warning cabdrivers of the recent offenses in the area. Secondly, the government had an interest in stopping the series of offenses, especially since the assailant demonstrated a propensity for violence. In our opinion, these governmental interests for stopping the cabs, warning the drivers, and looking at the passengers outweighed the minimal intrusion into defendant's fourth amendment rights. The inconvenience to citizens stopped was minimal. Accordingly, the stop in this case is justified under the balancing approach applied in *Prouse* and *Meitz*.

In sum, the stop here was based on objective criteria. Only cabs were stopped, and only cabs in the limited area where offenses had occurred the previous two days were stopped. Furthermore, the cab in which defendant was a passenger was stopped during the early morning hours, the time of day when the offenses occurred. Under these circumstances, we believe that the risk of an arbitrary and abusive stop does not exceed tolerable limits.

We further conclude that once the cab was legitimately stopped, the officers had probable cause to arrest defendant. He matched the description given by the victims of two of the offenses and resembled the composite drawing of the assailant. Although we recognize that a

general description is insufficient to provide the probable cause necessary to justify an arrest, unless it is supported by other relevant facts and circumstances known to the arresting officer (*In re Woods* (1974), 20 Ill. App. 3d 641, 646, 314 N.E.2d 606), the description here was more specific than that in *Woods*, and the arresting officer had a composite drawing of the assailant. In addition, defendant was riding in a cab in the limited area in which all of the crimes had occurred. This latter fact has probative value, despite the fact that there was also a female passenger in the cab. In short, we are of the opinion that probable cause to arrest existed because the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a man of reasonable caution in believing that defendant had committed an offense. See *People v. Creach* (1980), 79 Ill. 2d 96, 101, 402 N.E.2d 228, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564.

For the aforementioned reasons, we reverse the convictions of defendant for murder and attempted armed robbery, and the cause is remanded for a new trial.

Reversed and remanded.

McGILLICUDDY and RIZZI, JJ., concur.