THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEROY MITCHELL, Defendant-Appellant.

First District (5th Division)   No. 1—88—2655

Opinion filed April 3, 1992.

MURRAY, J., specially concurring.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and Jane Liechty Loeb, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

On October 7, 1985, defendant Leroy Mitchell was charged along with codefendants Fred Halmon and Ruben Young in connection with the 1983 murder of Joyce Partridge, the feticide of her unborn child, the attempted murder of Eugene Anderson (Ms. Partridge's companion), and the attempted armed robbery of both Partridge and Anderson. Following a combined hearing on motions to quash arrest and suppress evidence, defendants were tried separately. A jury convicted Mitchell of murder (based on an accomplice liability theory) and attempted armed robbery. On July 15, 1988, he was sentenced only for murder to 40 years' imprisonment.

On appeal, Mitchell alleges not only that the trial court erroneously denied his motion to quash arrest and suppress evidence, but also argues that he was denied a fair and impartial trial because of the trial judge's bias and improper remarks. Mitchell further maintains that he should be granted a new trial because of pretextual explanations offered by the State in response to defense charges of racial discrimination in its exercise of peremptory challenge of jurors. Finally, Mitchell argues that he should be granted a new sentencing hearing, alternatively, because the sentence imposed was excessive, or because the court erroneously believed that he was eligible for an extended term. For the reasons stated below, we reverse defendant Mitchell's convictions and remand for an attenuation hearing, a new trial and sentencing hearing.

■ We have previously set forth the facts surrounding the shooting of Partridge and the attempted armed robbery of Partridge and Anderson in *People v. Halmon* (1992), 225 Ill. App. 3d 259, 263-64, and hereby adopt that statement for purposes of this appeal. Because the circumstances surrounding the seizure of defendant Mitchell are essentially the same as those in *Halmon*, we further adopt the *Halmon* court's reasoning as regards both the absence of probable cause to arrest this defendant and the lack of this defendant's consent to voluntarily accompany the police and submit to over 30 hours of intermittent interrogation including a polygraph examination. Accordingly, we conclude that Mitchell, like Halmon, was illegally detained without probable cause. We therefore follow the *Halmon* holding and reverse the trial court's denial of Mitchell's motion to quash arrest and suppress evidence, and remand for an attenuation hearing so that the trial court may determine in the first instance if Mitchell's confes-

sion was sufficiently attenuated from the earlier arrest to purge it from the taint of the illegal seizure.

If, on remand, the trial court determines that there is insufficient attenuation to purge Mitchell's confession from the taint of the prior illegal seizure, it is directed to suppress the confession and to conduct further proceedings consistent with the remainder of the views expressed herein, also noting that if Halmon's murder conviction is ultimately reversed, conviction of Mitchell as an accomplice would be clearly erroneous.

If, on the other hand, the trial court concludes that attenuation was sufficient to purge Mitchell's confession from any prior taint, it must consider his further contention that his confession was in fact coerced.[1] If such is indeed the case, the trial court must suppress the confession and proceed as noted above. Only if Mitchell's confession is fully attenuated and free from coercion may it be admitted into evidence at a new trial.

We further conclude that Mitchell is entitled to be tried anew, as he was deprived of a fair and impartial trial by the impermissible bias displayed by the trial judge. Illinois courts have long upheld the right of an accused to a fair and impartial trial by jury, "free from influence or intimation by the trial court." (*People v. Sprinkle* (1963), 27 Ill. 2d 398, 402, 189 N.E.2d 295, 298. See also *People v. Santucci* (1962), 24 Ill. 2d 93, 180 N.E.2d 491.) Our supreme court has cautioned that jurors are "ever watchful of the attitude of the trial judge" and noted that the judge's lightest word "may prove controlling." (See *People v. Marino* (1953), 414 Ill. 445, 450-51, 111 N.E.2d 534.) Moreover, the appellate court has held that a conviction tainted with such judicial error must be reversed "to protect and preserve the integrity and reputation of the judicial process." *People v. Kelley* (1983), 113 Ill. App. 3d 761, 767, 447 N.E.2d 973.

■ In the case at bar, the trial judge displayed bias against the defense in numerous ways. At times he made disparaging remarks regarding defense evidence and theories. This occurred when the defense attorney attempted to impeach the State's complaining witness, Mr. Andersen, who had testified that the public defender who had in-

---

[1]The record of the suppression hearing reveals that a full exploration of the alleged coercion was thwarted by the trial judge, who not only barred the cross-examination of Detective Vucko regarding his treatment of Mitchell, but also banned the introduction of relevant evidence (including Mitchell's denials of involvement as well as claims regarding misrepresentation of the polygraph test) and also impermissibly relied on his own belief that Mitchell was coached by a "jailhouse lawyer."

terviewed him had misrepresented that he worked for the "District Attorney's Office." On recross, defense counsel asked Andersen if he was aware that there was no such thing as a district attorney in Illinois. The court interrupted and undermined the value of any impeachment by stating that there was such a thing as a district attorney and such did exist in the Northern District of Illinois. Not only did the judge's statement distract the jury from any impeachment value, it also belittled defense counsel and represented testimony for the State. The judge further added to the testimony for the State with his remarks about tape recorders. When defense counsel questioned the State's Attorney who had taken Mitchell's statement about why he had not recorded it, the judge interjected that tape recorders "are not used in police stations" or in court. Additionally, the trial judge disparaged defense counsel's queries regarding lack of fingerprint evidence as well as his questions about the atmosphere in which the questioning of Mitchell occurred. When defense counsel asked Detective Vucko if he went to Mitchell's house to ask him questions, the judge stated:

> "Well, you can ask questions like that until midnight, they didn't go to the garage, they didn't go to the park, they didn't go to the moon, they just went to the station and that's it."

This mockery of the defense greatly undermined counsel's theory that Mitchell's statements were taken in a coercive atmosphere and could not help but communicate to the jury what the judge was thinking. The judge's attack on defense counsel continued when counsel tried to ask Mr. Mitchell what he told the police when they "asked" him to go to the station to be interrogated:

> "DEFENSE COUNSEL (Mr. Scholz): Did he say can I stay out here and you ask me the questions—
>
> PROSECUTOR (Mr. Steed): Objection.
>
> THE COURT: He just said he doesn't remember his exact words, and its quite obvious there was no conversation like the one you just made up."

The direct hostility to Mitchell was perhaps even more obvious during counsel's direct examination of his client. Counsel had just asked Mitchell what happened when the detective left the interrogation room when the following interchange took place:

> "MR. MITCHELL: After he left out the room I was walking around the room, walking around the desk saying to myself that I was being charged with a murder which I know I didn't commit and—
>
> THE COURT: Saying it to who?

MR. MITCHELL: Saying it to myself.

THE COURT: Oh, to yourself.

MR. MITCHELL: Yes, sir. I was saying I was being charged with a murder which I knew I didn't commit and I said now I am in trouble. I am in trouble with the police and I might be in trouble with (codefendants) Freddie and Ruben if I tell the police what happened.

THE COURT: Was all this to yourself?

MR. MITCHELL: Yes, sir.

THE COURT: Oh. Okay, next question."

In addition to hostility, disparagement, and testimony for the State, the trial judge's bias is also evident in his inconsistent rulings of law in favor of the State. No technical restrictions were applied to the State's opening statement, and the prosecutor explained without interruption the law of accountability and applied the law to the promised evidence. Yet, when defense counsel merely tried to explain to the jury that his client was presumed innocent, the judge interrupted *sua sponte* with the following interchange:

"DEFENSE COUNSEL (Mr. Scholz): And as he sits there before you, Mr. Mitchell is presumed—

THE COURT: No, no, no. We don't want to hear about the law. That's the Court's position. We just want to hear from you, Mr. Scholz, what you expect the evidence will demonstrate.

DEFENSE COUNSEL: Well, Judge I think the evidence and the law put together—

THE COURT: No, no, no. Just what you expect· the evidence will demonstrate. I'll instruct the jury as to the law."

Even if any one set of judicial remarks would not be enough to create prejudice and bias, these remarks were so pervasive at trial that, coupled with the judge's hostile attitude, they denied Mitchell the fair trial to which he is entitled. We therefore reverse and remand for a new trial.

■ Even if we were not to grant Mitchell a new trial because of the prejudicial effects of judicial bias, the improper use of prosecutorial peremptory challenges would mandate the same result. The fourteenth amendment forbids a prosecutor from using a peremptory challenge to excuse a juror solely on account of his race. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) *Batson* demands that once a defendant establishes a *prima facie* case of purposeful discrimination of a juror, the State must offer a race-neutral explanation for its challenge. We address only the propriety of

the State's explanations as the issue of whether defense has made out a case of *prima facie* discrimination becomes moot once the trial court has reviewed the race-neutral explanations and ruled on the ultimate question of intentional discrimination. (See *Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859. See also *People v. Walls* (1991), 220 Ill. App. 3d 564, 581 N.E.2d 264.) In the instant action, the only peremptory challenges exercised by the State were against the only blacks who had not been excused for cause. The State offered no reason for its challenge to prospective juror Rachel Woodall, stating only that the defense counsel "knows our reason." The court stated, "I think I know why the State excused Mrs. Woodall." These remarks do not constitute the race-neutral explanations contemplated by *Batson*. As to the other black juror, James Harris, the State explained its peremptory challenge on the basis that it had a rap sheet indicating a man with the same name, same age, and same build was once arrested in Los Angeles. However, as defendant notes, there is nothing in the record to suggest that prospective juror James Harris had ever been to Los Angeles, much less that he had ever been arrested there. Moreover, the State's failure to ask the judge to clarify any discrepancies as to Harris' identity lends weight to the argument that its excuse for striking him as a potential juror was clearly pretextual. Thus, the State's explanation for its challenge was not "clear, legitimate, trial-specific, and race-neutral" as required by *Batson*. (See also *People v. Cannon* (1992), 227 Ill. App. 3d 551, 554.) We therefore find that the State failed to rebut the *Batson* challenge and did not offer race-neutral explanations to satisfactorily rebut the inference that it had excluded Woodall and Harris from the jury due to their race. For these reasons as well, Mitchell is entitled to a new trial.

Because we have determined that Mitchell is to be retried because of judicial bias and the improper exercise of peremptory challenges, we do not address his additional claims pertaining to inflammatory prosecutorial remarks.

■ Mitchell's final arguments concern the propriety of the 40-year sentence imposed by the trial judge. He claims that the judge incorrectly considered him eligible for an extended term or alternatively abused his discretion by sentencing him to 40 years. While the record reveals that the trial judge considered an extended term appropriate, it also shows that he chose not to impose one, as he noted that "the evidence was not to the effect that this particular defendant held the gun at the time of the shooting." In light of our previous determina-

tion of judicial bias, we consider it appropriate that a new sentencing hearing follow Mitchell's trial.

Reversed and remanded.

LORENZ, J., concurs.

JUSTICE MURRAY, specially concurring:

I agree with the well-reasoned majority opinion as it accurately sets forth and applies the law.

As to the use of peremptory challenges to exclude minority jurors only because of their minority status, I believe it's about time to point out that the first abuse in the common law of using challenges to exclude otherwise fair jurors was to exclude majorities rather than minorities. It occurred in Dublin, Ireland, in 1844. In 1844 the great Irish patriot, Daniel O'Connell, and eight of his political supporters were charged with conspiracy and other misdemeanors. O'Connell was the first Irish Catholic mayor of Dublin. Like Harold Washington, the first African-American mayor of Chicago, he acted with absolute impartiality to all without consideration of political or religious affiliation.

The names of over 20 Irish Catholics (a majority in Dublin) were omitted from the panel of jurors from which the venire persons to decide O'Connell's and his eight supporters' case were to be selected. When the jury was being questioned, the English Crown found 11 more "Irish Catholics" on the panel. All 11 were challenged and excluded as jurors in the case. O'Connell and the eight were found guilty, fined and sentenced to one year's imprisonment.

O'Connell and the eight appealed, charging as the only traverser, or error, the exclusion of the 11 Irish Catholic jurors. Lord Dewman, then chief justice of England's high court, reversed the convictions on those grounds in a strongly worded opinion. (M. Hayden & G. Moonan, A Short History of the Irish People From Earliest Times to 1920, 492-93 (1921).) Like many of today's minorities, O'Connell remained in confinement from his conviction to the date it was overturned.

I point these facts out for the sole purpose of showing that prejudice of any sort has no place in our American system of justice.